BASIC CAPITAL MANAGEMENT, INC., American Realty Trust, Inc., Transcontinental Realty Investors, Inc., Continental Poydras Corp., Continental Common, Inc., and Continental Baronne, Inc., Petitioners,

v.

DYNEX COMMERCIAL, INC. and Dynex Capital, Inc., Respondents.

No. 08–0244.

Supreme Court of Texas.

Argued Sept. 10, 2009.

Decided April 1, 2011.

Rehearing Denied Oct. 21, 2011.

Lawrence J. Friedman, James Robert Krause, William Carter Boisvert, Friedman & Fieger, L.L.P., William V. Dorsaneo III, SMU School of Law, J. Robert Arnett II, Munck Butrus Carter, P.C., Dallas, TX, John Augustine Sopuch III, The Law Offices of John A. Sopuch III, St. Croix City, TX, Bart F. Higgins, Friedman & Fieger, L.L.P., Carlos G. Lopez, Vincent & Moye, P.C., Kenneth F. Nye, Thomas V.

Murto, III, Law Offices of R. Jack Ayres, Jr., G. Michael Gruber, Godwin Gruber, P.C., Christopher Louis Kurzner, Kurzner PC, Michael Lewis Gaubert, Friedman & Fieger, L.L.P., Eric V. Moyè, Vial, Hamilton, Koch & Knox, John Frederick Redwine, Eric Redwine Law Offices, Jamil N. Alibhai, Munck Butrus Carter, P.C., Dallas, TX, Thomas R. Phillips, Baker Botts L.L.P., Austin, TX, Allyson Newton Ho, Morgan, Lewis & Bockius LLP, Houston, TX, Melissa J. Armstrong, Baker Botts L.L.P., Dallas, TX, for Basic Capital Management, Inc.

William Richard Thompson II, Deborah G. Hankinson, Hankinson Levinger LLP, Charles L. Perry, Andrews & Kurth, L.L.P., Dallas, TX, Elana S. Einhorn, The University of Texas School of Law, Austin, TX, Ryan D. Clinton, Hankinson Levinger LLP, Dallas, TX, for Dynex Commercial, Inc.

Justice HECHT delivered the opinion of the Court.

This is an action for breach of a commitment to provide financing for future real estate investments. The borrowers were to be entities that would be formed to hold each investment separately as opportunities arose. We hold that the corporate owners of those entities were third-party beneficiaries of the commitment, and that consequential damages for the lender's breach of the commitment were foreseeable. We reverse the judgment of the court of appeals[1] and remand the case to that court for further consideration.

## I

Basic Capital Management, Inc. managed publicly traded real estate investment trusts in which it also owned stock, including American Realty Trust, Inc. ("ART") and Transcontinental Realty Investors, Inc. ("TCI").[2] We refer to the three collectively as petitioners. Respondent Dynex Commercial, Inc. provided financing for multi-family and commercial real estate investors.[3]

ART and TCI held investment property through wholly owned "single-asset, bankruptcy-remote entities"—SABREs, for short. A SABRE, as the term for which it stands suggests, is an entity that owns a single asset and whose solvency is independent of affiliates. Lenders like Dynex commonly require a SABRE as a borrower so that in the event of default, the collateral can be recovered more easily than from a debtor with multiple assets and multiple creditors.[4]

After several months of discussions and negotiations, Dynex agreed to loan three

---

**1.** 254 S.W.3d 508 (Tex.App.-Dallas 2008).

**2.** Another real estate investment trust managed by Basic and involved in the events leading to this case, Continental Mortgage and Equity Trust, Inc., merged into TCI after litigation began. For simplicity, we ascribe Continental's pre-suit actions to TCI. In 1998, the time period relevant to this case, Basic had assets of about $3 billion, ART about $1.3 billion, Continental about $426 million, and TCI about $445 million.

**3.** Dynex Commercial, Inc. underwrote, closed, and serviced loans funded by Dynex

Capital, Inc., also a respondent in the case. Our references to Dynex are to Dynex Commercial.

**4.** *See, e.g., In re Gen. Growth Props., Inc.,* 409 B.R. 43, 49 n. 15 (Bankr.S.D.N.Y.2009) ("Sometimes referred to as a 'single-purpose entity' or 'bankruptcy remote entity,' an SPE has been described by one commentator as 'an entity, formed concurrently with, or immediately prior to, the closing of a financing transaction, one purpose of which is to isolate the financial assets from the potential bankruptcy estate of the original entity, the borrower or originator.' David B. Stratton, *Spe-*

TCI-owned SABREs[5] $37 million to acquire and rehabilitate three commercial buildings—one each—in New Orleans if Basic would propose other acceptable SABREs to borrow $160 million over a two-year period.[6] The agreements were eventually formalized in letters. The New Orleans Agreement was between Dynex and TCI and provided in part:

> Dynex Commercial, Inc. (Lender) herein agrees to provide financing for the acquisition and/or rehabilitation of the captioned three (3) properties located in New Orleans, Louisiana under the following terms and conditions:
>
> 1.  BORROWER: Three (3) single asset, bankruptcy remote borrowing entities, acceptable to Lender....

TCI accepted the agreement as "borrower", although it is not a SABRE. The $160 million commitment ("the Commitment") was between Dynex and Basic. It also stated that each borrower would be a "Single Asset, Bankruptcy Remote Borrowing Entity acceptable to Lender". The SABREs would be owned by ART or TCI. "First and foremost," Dynex stressed, "the two transactions [were] intertwined."

Dynex loaned TCI's three SABREs the money to acquire the New Orleans buildings and funded a $6 million loan presented by Basic under the Commitment. But then market interest rates rose, making the terms of the Commitment unfavorable to Dynex. Dynex refused to provide further funding for improvements to the New Orleans buildings or to make any other loans under the Commitment.

Petitioners sued Dynex for breach of the Commitment, alleging that as a result, transactions that would have qualified for funding were financed elsewhere at higher rates or not at all. Petitioners claimed damages for interest paid in excess of what would have been charged under the Commitment and for lost profits from investments for which financing could not be found. TCI also sued Dynex for breach of the New Orleans Agreement. Dynex counterclaimed against petitioners for fraud.

ART and TCI alleged that they "were intended beneficiaries of the $160 million Commitment because their wholly owned subsidiaries would own the properties and borrow the funds advanced by Dynex Commercial under the commitment." Dynex controverted this claim, pleading that ART and TCI "lack[ed] standing to assert claims under the alleged $160 million loan commitment". Dynex and petitioners filed cross-motions for partial summary judgment on the issue, and the trial court granted petitioners' motion. Based on its ruling, the trial court issued an order *in limine* forbidding reference to the standing arguments before the jury.

After a trial of over a month, the jury returned a petitioners' verdict. The jury

*cial–Purpose Entities and Authority to File Bankruptcy*, 23–2 AM. BANKR.INST. J. 36 (March 2004). 'Bankruptcy-remote structures are devices that reduce the risk that a borrower will file bankruptcy or, if bankruptcy is filed, ensure the creditor procedural advantages in the proceedings.' MICHAEL T. MADISON, ET AL., THE LAW OF REAL ESTATE FINANCING, § 13:38 (2008).'').

5.  The three, Continental Poydras Corp., Continental Common, Inc., and Continental Bar-

onne, Inc., were plaintiffs in the trial court, but the jury awarded them no damages. They are petitioners in this Court, but they do not complain of the verdict or make any arguments apart from TCI's.

6.  Dynex contends that the commitment period was only eighteen months. The difference is immaterial to our opinion.

found that Dynex breached the Commitment, resulting in $256,233.25 lost profits for Basic, $25,367,090 lost profits for ART and TCI, and $2,183,287 increased costs in obtaining alternate financing for ART and TCI. The jury also found that TCI lost $252,577 profits as a result of Dynex's breach of the New Orleans Agreement.[7]

Dynex moved for judgment notwithstanding the verdict. Among other things, Dynex re-urged what it had earlier called its standing argument: that ART and TCI could not recover damages for breach of the Commitment, nor TCI for breach of the New Orleans Agreement, because neither was a party to, nor a third-party beneficiary of, those agreements. Dynex also argued that Basic could not recover lost profits for breach of the Commitment because such consequential damages were not reasonably foreseeable when the Commitment was made. The trial court granted the motion and rendered a take-nothing judgment for Dynex.

Petitioners appealed. The parties raised a number of issues, but the court of appeals found two to be dispositive and focused on them.[8] First, it agreed with Dynex that ART and TCI were not third-party beneficiaries of the Commitment, nor TCI of the New Orleans Agreement.[9]

Both agreements, the court reasoned, were expressly made for the benefit of the borrowers—the SABREs that ART or TCI were to create as occasion arose—and any benefit to ART and TCI was at most indirect and therefore unrecoverable.[10] Petitioners countered that Dynex was contending, in essence, that ART and TCI were "not entitled to recover in the capacity in which [they sued]", a matter Dynex had not raised by a verified pleading as required by Rule 93(2) of the Texas Rules of Civil Procedure,[11] and therefore could not assert. The court of appeals rejected petitioners' argument.[12]

Second, the court held that Basic could not recover lost profits as consequential damages for Dynex's breach of the Commitment because there was no evidence that Dynex knew, when it made the Commitment, what specific investments would be proposed, or that other financing would not be obtainable.[13] Having concluded that there was no basis for any recovery by ART and TCI, the court did not consider Dynex's challenges to their damage claims.[14] The court affirmed the trial court's judgment.

We granted the petition for review.[15]

## II

We consider first whether ART and TCI can recover for breach of the Commitment,

---

7. The jury found that petitioners' reasonable attorney fees were $1.95 million through trial and $150,000 for any appeal.

8. 254 S.W.3d 508 (Tex.App.-Dallas 2008).

9. *Id.* at 518, 524.

10. *Id.* at 517–518. The court also concluded that ART and TCI had failed to plead that they were actually parties to the Commitment because Basic had been acting as their agent. *Id.* at 518.

11. *Id.* at 514; Tex.R. Civ. P. 93(2) ("A pleading setting up any of the following matters, unless

the truth of such matters appear of record, shall be verified by affidavit.... 2. That the plaintiff is not entitled to recover in the capacity in which he sues, or that the defendant is not liable in the capacity in which he is sued.").

12. 254 S.W.3d at 515, 524.

13. *Id.* at 521–522.

14. *Id.* at 522 & n. 16.

15. 52 Tex.Sup.Ct.J. 599 (Apr. 17, 2009).

and TCI for breach of the New Orleans Agreement, as third-party beneficiaries.

■ We agree with the court of appeals that Dynex's failure to file a verified denial under Rule 93(2) does not preclude it from contesting ART's and TCI's right to recover as non-parties. Though the requirement of a verified denial to challenge a plaintiff's capacity to recover has long been part of Texas civil procedure,[16] the case law is somewhat confused about when the requirement applies.[17] The issue is made more difficult here because Dynex pleaded its challenge as lack of standing, which need not be raised by verified denial.[18] These problems need not detain us here. Regardless of whether the issue is properly denominated standing, as the parties seemed to think in the trial court, or capacity, as petitioners have argued on appeal, the *substance* of Dynex's asser-

tion—that ART and TCI cannot recover for Dynex's breaches of its agreements because they were not parties to the agreements—was addressed in cross-motions for summary judgment and adjudicated prior to trial. Not only was the matter raised by Dynex in its motion without objection,[19] it was raised by petitioners themselves in their own motion, and then adjudicated in their favor. At that point, there was no longer any reason for a verified pleading,[20] and the trial court's post-trial about-face did not resurrect the pleading requirement.

■ The law governing third-party beneficiaries is relatively settled:

> The fact that a person might receive an incidental benefit from a contract to which he is not a party does not give that person a right of action to enforce

---

16. Act of May 13, 1846, 1st Leg., R.S., § 31, 1846 Tex. Gen. Laws 363, 371, *reprinted in* 2 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 1669, 1677 (Austin, Gammel Book Co. 1898); *Sixth RMA Partners v. Sibley*, 111 S.W.3d 46, 56 (Tex.2003); ("When capacity is contested, Rule 93 requires that a verified plea be filed unless the truth of the matter appears of record."); *Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex.1996) ("We have not hesitated in previous cases to hold that parties who do not follow rule 93's mandate waive any right to complain about the matter on appeal.").

17. *See Schoellkopf v. Pledger*, 739 S.W.2d 914, 920–921 (Tex.App.-Dallas 1987) ("It is something of an understatement to say that the cases have not been entirely consistent in determining whether a defendant must have filed a verified denial of the plaintiff's right to recover in the capacity in which he sues in order to complain on appeal that the plaintiff failed to prove ownership of the cause of action asserted." (citing cases)), *rev'd*, 762 S.W.2d 145, 146 (Tex.1988) (per curiam) (stating elliptically that "[t]he rule means just what it says").

18. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex.2005) ("Unlike standing, however, which may be raised at any time, a challenge to a party's capacity must be raised by a verified pleading in the trial court.").

19. *See Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex.1991) ("In this case, Respondents moved for summary judgment based on the affirmative defense of no consideration. Although Respondents did not plead the affirmative defense upon which their motion for summary judgment relies, they did expressly rely on this affirmative defense in their motion for summary judgment. Because Roark failed to direct the trial court's attention to the absence of the pleading in his written response or before the court rendered judgment, this complaint may not be raised on appeal.").

20. *See Schoellkopf*, 739 S.W.2d at 921 ("The purpose of requiring that certain matters be denied by verified pleadings or waived is to eliminate from trial issues not seriously contested.").

the contract. A third party may recover on a contract made between other parties only if the parties intended to secure some benefit to that third party, and only if the contracting parties entered into the contract directly for the third party's benefit.

\* \* \*

■■■ In determining whether a third party can enforce a contract, the intention of the contracting parties is controlling. A court will not create a third party beneficiary contract by implication. The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied. Consequently, a presumption exists that parties contracted for themselves unless it clearly appears that they intended a third party to benefit from the contract.[21]

And of course, "[w]hen a contract is not ambiguous, the construction of the written instrument is a question of law for the court."[22]

■■ Dynex knew that the purpose of the Commitment was to secure future financing for ART and TCI, real estate investment trusts that Basic managed and in which it held an ownership interest. Basic was never to be the borrower. On the contrary, the Commitment expressly required that the borrowers be SABREs acceptable to Dynex. Nor was Basic to own the SABREs. Dynex knew that Basic's business was to manage the investment trusts that created and owned the SABREs as part of their investment portfolio. The requirement that all borrowers be SABREs was for Dynex's benefit, to provide more certain recourse to the collateral in the event of default.

As a practical matter, the parties knew that it would likely not be a SABRE that would enforce the Commitment. By its very nature as a single-asset entity, a SABRE would not be created until an investment opportunity presented itself, and without financing, there would be no investment. It would be unreasonable to require ART and TCI to have created SABREs for no business purpose, merely in order that those otherwise inert entities could sue Dynex.

The court of appeals was concerned that the benefit to ART and TCI was indirect in the sense that it flowed through the SABRE-borrowers.[23] We certainly agree that as a general proposition, a corporate parent is not a third-party beneficiary of its subsidiary's contract merely by virtue of their relationship. But here the benefit to each SABRE not only inured to its parent, the transaction was so structured to benefit Dynex. SABRE-borrowers provided a mechanism for ART and TCI to hold investment property directly but in a way that would provide Dynex greater security. If Dynex and Basic did not intend the Commitment to benefit ART and TCI directly, then the Commitment had no purpose whatever.

Dynex and Basic could have prevented any doubt about their intentions by expressly stating in the Commitment that it was to benefit ART and TCI. Perhaps they did not do so because it seemed to go

---

**21.** *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 651 (Tex.1999) (citations and internal quotation marks omitted).

**22.** *Id.* at 650.

**23.** 254 S.W.3d at 517–518.

without saying. But we need not speculate. The Commitment "clearly and fully spelled out" the benefit to ART and TCI because their role was basic to Dynex's and Basic's agreement.

Dynex insists that ART's and TCI's failure to request a jury finding on whether they were third-party beneficiaries is fatal to their recovery on that theory. But as we noted above, the proper construction of an unambiguous contract is a matter of law. The Commitment itself, and the undisputed evidence regarding its negotiation and purpose,[24] establish that ART and TCI were third-party beneficiaries.

■ Dynex argues that the New Orleans Agreement consisted of the promissory notes signed by each of TCI's three SABREs, and that TCI was not a third-party beneficiary of the obligations set out in those notes. But the notes were executed pursuant to a commitment by Dynex that TCI itself signed. As a party to the commitment that provided the New Orleans Agreement financing for its SABREs, TCI was a third-party beneficiary of the Agreement.

Accordingly, we conclude that ART and TCI were entitled to recover for Dynex's breach of the Commitment and the New Orleans Agreement.

## III

■ We turn to the second issue addressed by the court of appeals: whether Basic is precluded from recovering lost profits as consequential damages for breach of the Commitment because Dynex could not reasonably foresee them. Foreseeability is a fundamental prerequisite to the recovery of consequential damages for breach of contract.

Consequential damages are those damages that result naturally, but not necessarily, from the defendant's wrongful acts. They are not recoverable unless the parties contemplated at the time they made the contract that such damages would be a probable result of the breach. Thus, to be recoverable, consequential damages must be foreseeable and directly traceable to the wrongful act and result from it.[25]

The foreseeability requirement finds its most familiar expression in the venerated case of *Hadley v. Baxendale.* Baxendale, a common carrier, failed to timely deliver Hadley's steam engine crankshaft to engineers for repairs, and Hadley sued for lost profits from his mill as a result of the delay. The court disallowed recovery of the damages because Baxendale had no reason to know delay would have such consequences. The correct rule, according to the court, was this:

Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the

**24.** *See Banker v. Breaux,* 133 Tex. 183, 128 S.W.2d 23, 24 (1939) (stating that the contracting parties' intention, which is of controlling importance, must be ascertained from their agreement "in the light of the attending circumstances").

**25.** *Stuart v. Bayless,* 964 S.W.2d 920, 921 (Tex.1998) (per curiam) (citations and internal quotation marks omitted).

contemplation of both parties at the time they made the contract as the probable result of the breach of it.[26]

The *Restatement (Second) of Contracts* states the rule as follows:

(1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.

(2) Loss may be foreseeable as a probable result of a breach because it follows from the breach

(a) in the ordinary course of events, or

(b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.

(3) A court may limit damages for foreseeable loss by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation.[27]

Dynex contends that when it issued the Commitment, it could not have foreseen that its breach would cause Basic to suffer lost profits because it had no idea what specific investments Basic would propose or that alternative financing for them would be unavailable. The court of appeals agreed, concluding that Dynex could not be liable for Basic's lost profits unless it

knew, at the time it entered into the [Commitment]: (1) that the contracted financing was for a specific venture; and (2) that in the event of its breach the borrower probably would be unable to obtain other financing in a manner that would permit the borrower to carry out that venture.[28]

Certainly, a general knowledge of a prospective borrower's business does not give a lender reason to foresee the probable results of its refusal to make the loan. But Dynex cites no authority, and we are aware of none, for the proposition that the consequences of a lender's breach of a loan commitment are not reasonably foreseeable unless the lender knew, at the time the commitment was made, not only the nature of the borrower's intended use of the money, but the specific venture in which the borrower intended to engage. One case, *National Bank of Cleburne v. M.M. Pittman Roller Mill,*[29] is to the contrary. There, the Bank breached its agreement to loan the Mill $14,000 to buy wheat, and the Mill sued for the profits it would have made from the resale.[30] The trial court rendered judgment for the Mill, but the commission of appeal reversed because there was no evidence that the Bank knew the Mill intended to resell the wheat.[31] Had there been such evidence, however, the Bank need not have known to whom the Mill intended to sell the wheat.

If, as found by the trial court, it was in contemplation of the parties at the

**26.** 9 Exch. 341, 354, 156 Eng. Rep. 145, 151 (1854).

**27.** RESTATEMENT (SECOND) OF CONTRACTS § 351 (1981).

**28.** 254 S.W.3d at 520.

**29.** 265 S.W. 1024 (Tex. Comm'n App. 1924, holding approved).

**30.** *Id.*

**31.** *Id.* at 1024, 1026.

time of the contract that [the Mill] was to engage in the business of buying and selling wheat with the hope of deriving a profit therefrom, it would be entitled, under proper pleading, to recover whatever net profits it could show that it would have made had the terms of the contract been complied with. If [the Bank] knew at the time it obligated itself to loan the $14,000 that the [Mill] intended to use this sum in purchasing wheat to be sold for a profit, it could not excuse itself from liability for its wrong in breaching its contract on the plea that at the time of the contract it was uncertain whether there would be any profits at all. If it contracted that [the Mill] should reap the benefit of profits, should there be any, it should be required to pay whatever damages [the Mill] could show had been sustained by being deprived of such profits.[32]

Although this Court approved only the holding and judgment of the commission of appeals, we nevertheless regard its reasoning as sound. To be liable for the consequential damages resulting from a breach of a loan commitment, the lender must have known, at the time the commitment was made, the nature of the borrower's intended use of the loan proceeds but not the details of the intended venture.

There is no question Dynex knew that Basic's purpose in arranging the $160 million Commitment was to ensure financing for ART's and TCI's real estate investments. Dynex's executive vice president testified: "We were aware ... that they were involved in significant commercial and multifamily endeavors [and] were constantly buying, selling, improving, doing the normal and usual things that a real estate developer does to enhance values."

Dynex was in the business of providing capital for large real estate transactions and had entered into a number of other similar loan arrangements. For months, Dynex discussed with Basic its intended uses of the financing and negotiated detailed requirements for the loans to be made under the Commitment, including the specification that the borrowers by SABREs. In sum, the evidence establishes that Dynex clearly knew how the Commitment would be used. Indeed, it would be surprising if Dynex had agreed to lend Basic $160 million without such knowledge.

Dynex certainly knew that if market conditions changed and interest rates rose, its refusal to honor the Commitment would leave Basic having to arrange less favorable financing. Because that is in fact what happened, Dynex argues that it had no reason to expect that Basic's increased financing costs would price some investments beyond reach, resulting in opportunities lost altogether. But we cannot infer from Basic's ability to arrange for alternate financing in a few instances that it could always do so, and nothing in the record supports such a counterintuitive proposition. Certain that its breach would increase Basic's costs, Dynex cannot profess blindness to the foreseeability that its breach would also cost Basic business.

Which is not to say that it actually did. The court of appeals held that the lost profits Basic claims as consequential damages were not foreseeable to Dynex at the time the Commitment was made, and on this issue we disagree. Dynex also argues, in this Court as in the court of appeals, that even if lost profits were foreseeable, they were not sustained. The court of

32. *Id.* at 1025.

appeals did not address that argument, and neither do we. It, among many others that the parties have raised, we leave for further consideration by the court of appeals on remand.

\*　　\*　　\*

Accordingly, we reverse the judgment of the court of appeals and remand the case to that court for further consideration.