

NUMBER 13-16-00099-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG

FIRST CASH, LTD.,                                                            Appellant,

v.

JQ-PARKDALE, LLC, H&JQ PD, LLC, W-SB
STAPLES/SPID, LLC, R-SB STAPLES/SPID, LLC,
PARKDALE INCOME PARTNERS, LP, AND
CAPITAL AREA RETAIL DEVELOPMENT II, INC.,                Appellees.

On appeal from the 319th District Court
of Nueces County, Texas.

## OPINION

**Before Justices Rodriguez, Contreras, and Longoria**
**Opinion by Justice Rodriguez**

First Cash, Ltd. filed this suit alleging that its lease at the Parkdale Shopping Center

was breached by two groups of parties:

(1)    the "Legacy Landlords," a group of the four LLCs that once owned the

shopping center; and

(2)     the "Current Landlords," the two entities that currently own the shopping center.[1]

A jury awarded First Cash two forms of damages on its claim for breach of lease against the Legacy Landlords:   damages for building costs and for the lost value of the breached lease.   On cross-appeal, the Legacy Landlords assert that there is insufficient evidence to support either award.   We affirm the award of damages for building costs, but we reverse and remand the award for the lost value of the breached lease.

The jury also awarded First Cash attorney's fees, but the trial court granted judgment notwithstanding the verdict ("JNOV") denying the award.   On appeal, First Cash challenges the JNOV, asserting that the trial court misconstrued the attorney's fees statute.   We affirm the entry of JNOV.[2]

## I.     BACKGROUND

In September 2001, First Cash entered into a lease for space in the Parkdale Shopping Center in Corpus Christi.   The lease had one ten-year term, with two additional five-year options that, if exercised, would come to term in September 2021.   The lease provided that in the event of casualty and significant loss of the premises' value, the Landlords could terminate the lease.

In 2007, the owners of the Legacy Landlords entered into talks with Walmart to explore a redevelopment plan, wherein several buildings in the Parkdale Shopping Center

---

[1] The "Legacy Landlords" consist of appellees/cross-appellants JQ-Parkdale, LLC; H&JQ PD, LLC; W-SB Staples/SPID, LLC; and R-SB Staples/SPID, LLC.   The "Current Landlords" consist of appellees Parkdale Income Partners, LP (PIP), which owns a 99% interest in the shopping center; and Capital Area Retail Development II, Inc. (CARD II), which owns a 1% interest in the shopping center and is the general partner of PIP.   We refer to both groups together as "the Landlords."

[2] First Cash also briefly challenges the directed verdict which was granted in favor of the Current Landlords.   We affirm the directed verdict.

2

would be demolished and a Walmart would be built in their place. The Legacy Landlords' owners told First Cash's management of its possible plan.

On June 22, 2009, a fire occurred at the shopping center, damaging a portion of the main building. The fire did not damage the separate building containing First Cash's store. Three weeks after the fire, the Legacy Landlords notified First Cash that it was terminating First Cash's lease as a result of the alleged fire damage. First Cash vacated the premises in December 2009 and moved into a new location less than a mile away. First Cash demanded compensation from the Landlords for the value of its breached lease and for the cost to make improvements to its new location, which were allegedly necessary to bring the location into useable condition. First Cash filed this suit in the fall of 2010.

Meanwhile, the Landlords completed a partial sale of the Parkdale Shopping Center to Walmart. Ultimately, most of the original retail space (including First Cash's former building) was demolished, and a large part of the land was sold to Walmart. Roughly 40,000 square feet of new, higher-quality retail space was constructed on the tract that remained in the Landlords' possession. At some point, the Legacy Landlords transferred all of its remaining interest in Parkdale to the Current Landlords. Both the Legacy and Current Landlords have the same owners.

The case went to trial in June of 2015. The trial court granted a directed verdict in favor of the Current Landlords. This directed verdict is the subject of First Cash's second issue on appeal.

A jury found that the Legacy Landlords breached the lease. The Legacy Landlords do not challenge this finding on appeal.

The jury awarded First Cash $182,400 as damages to compensate for the value of its breached lease under the "rent differential" measure of damages. The jury further awarded First Cash $130,000 as the cost to move its pawn shop into and build out a new location. These two awards are the subject of the Legacy Landlords' cross-appeal.

The jury also awarded First Cash $800,000 in attorney's fees through trial and $65,000 for various stages of appeal. The Legacy Landlords submitted a post-verdict motion opposing the award of attorney's fees. They asserted that because the Legacy Landlords were LLCs, they did not qualify as either an "individual or corporation" under the language of the attorney's fees statute. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West, Westlaw through 2017 1st C.S.). The trial court agreed and granted JNOV to exclude the attorney's fees.

## II. ATTORNEY'S FEES

By its first issue on appeal, First Cash asserts that the trial court erred in granting JNOV because it misinterpreted the attorney's fees statute, section 38.001. *See id.* All Texas and federal courts which have interpreted section 38.001 have held that LLCs cannot be held liable for attorney's fees under the plain meaning of the terms "individual or corporation." *See Alta Mesa Holdings, LP v. Ives*, 488 S.W.3d 438, 455 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Here, First Cash repeats many of the arguments that Texas courts have rejected based on sound and persuasive reasoning. *See, e.g.*, *id.* at 452–55; *Choice! Power, LP v. Feeley*, 501 S.W.3d 199, 211–14 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *Fleming & Assocs., LLP v. Barton*, 425 S.W.3d 560, 574–76 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). We reject these arguments for the reasons stated in *Alta Mesa*. *See* 488 S.W.3d at 452–55.

4

However, First Cash offers certain arguments that have not been previously addressed by Texas courts. According to First Cash, the attorney's fees statute was not meant to be interpreted according to the plain meaning of the separate terms "individual" and "corporation." Rather, the proper approach is to assess the phrase "individual or corporation" as a whole. First Cash asserts that this unified phrase has acquired a particular meaning apart from the separate words of which it is made. According to First Cash, this particular meaning is shown by the unique legislative history of the attorney's fees statute, as well as by similar uses of this phrase in related statutes. First Cash asserts that both of these aspects—legislative history and comparable usage—show the Legislature intended the phrase "individual or corporation" to refer to virtually any legal entity, including LLCs such as the Legacy Landlords.

To address this argument, we briefly summarize the history of the attorney's fees statute as a recodification from an earlier statute, as well as comparable uses of the phrase "individual or corporation" in other statutes.

## A. Standard of Review

Statutory construction is a question of law for the court to decide. *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). We review legal questions *de novo*. *Id.* The trial court may grant a JNOV if there is no evidence to support one or more of the jury findings on issues necessary to liability or if a legal principle precludes recovery. *Daftary v. Prestonwood Mkt. Square, Ltd.*, 404 S.W.3d 807, 814 (Tex. App.—Dallas 2013, pet. denied) (applying this rule in breach-of-commercial lease case). A no-evidence point will be sustained when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the

5

only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004).

**B.      Statutory Interpretation and Recodification**

Our fundamental goal when reading statutes is to give effect to the Legislature's intent. *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017). We rely on the plain meaning of a statute's words as expressing legislative intent unless a different meaning is supplied, is apparent from the context, or the plain meaning of the words leads to absurd results. *Id.* Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly. *Colorado Cty. v. Staff*, 510 S.W.3d 435, 452 (Tex. 2017). We presume the Legislature "chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen." *Cadena*, 518 S.W.3d at 325–26. We may not interpret a statute in a way that renders any part of it meaningless. *Randol Mill Pharmacy v. Miller*, 465 S.W.3d 612, 617 (Tex. 2015).

In construing the meaning of a statute, courts may also consider other factors such as the circumstances under which the statute was enacted and the statute's legislative history. Tex. Gov't Code Ann. § 311.023(2)–(3) (West, Westlaw through 2017 1st C.S.). If possible, courts are to construe statutes so as to harmonize with other relevant laws. *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 311 (Tex. 2010) (orig. proceeding).

"For more than thirty years, our statutes have undergone a continuing process of codification and in some instances recodification." *Fleming Foods of Tex., Inc. v.*

6

*Rylander*, 6 S.W.3d 278, 283 (Tex. 1999). The Legislature charged the Texas Legislative Council with the task of revising statutes to "clarify and simplify" them, but with the restriction that the Legislative Council "may not alter the sense, meaning, or effect of [a] statute." *Id.* That is, recodifications must be nonsubstantive. *See id.* at 284.

However, when the specific provisions of a recodification are "direct, unambiguous, and cannot be reconciled with prior law," the recodification must be given effect according to its plain terms, and the prior, repealed statute will not control. *Id.* at 286. The Legislature's general statement that a recodification is nonsubstantive "cannot revive repealed statutes or override the clear meaning of a new, more specific statute." *Id.*

## C. Current and Former Attorney's Fees Statutes

"Under the American Rule, litigants' attorney's fees are recoverable only if authorized by statute or by a contract between the parties." *Intercont'l Grp. P'ship v. KB Home Lone Star LP*, 295 S.W.3d 650, 653 (Tex. 2009). The current attorney's fees statute provides that a "person" may recover attorney's fees from "an individual or corporation" for a claim under an oral or written contract. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8). This provision is to be liberally construed to promote its underlying purpose, which is to "encourage contracting parties to pay their just debts and discourage . . . vexatious, time-consuming and unnecessary litigation." *Ventling v. Johnson*, 466 S.W.3d 143, 155 (Tex. 2015) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 38.005 (West, Westlaw through 2017 1st C.S.)).

Section 38.001 was enacted in 1985 as a recodification. The predecessor statute was article 2226 of the Texas Revised Civil Statutes, which provided that "[a]ny person, corporation, partnership, or other legal entity having a valid claim against *a person or*

7

*corporation* for . . . suits founded on oral or written contracts" may recover a reasonable amount as attorney's fees. *Lake LBJ Mun. Util. Dist. v. Coulson*, 839 S.W.2d 880, 890 (Tex. App.—Austin 1992, no writ) (op. on reh'g) (emphasis added); *see* Act of April 25, 1977, 65th Leg., R.S., ch. 76, § 1, 1977 Tex. Gen. Laws 153, 153–54 (former TEX. REV. CIV. STAT. ANN. art. 2226).

The attorney's fees statute is construed in accordance with the code construction act. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 1.002 (West, Westlaw through 2017 1st C.S.). The code construction act's broad definition of "person" includes "corporation, organization, government or governmental subdivision or agency, business trust, estate, trust, partnership, association, and any other legal entity." TEX. GOV'T CODE ANN. § 311.005(2) (West, Westlaw through 2017 1st C.S.). "Individual" is not defined by the civil practice and remedies code or the code construction act. However, the business organizations code defines "individual" as a "natural person." TEX. BUS. ORGS. CODE ANN. § 1.002(38) (West, Westlaw through 2017 1st C.S.).[3]

**D.     Recodification from Article 2226 to CPRC 38.001:  Excluding Government Defendants from Liability for Attorney's Fees**

To begin, we address First Cash's argument that the legislative history of the attorney's fee statute requires a broad construction of the phrase "individual or corporation" that includes LLCs. According to First Cash, the predecessor statute's phrase "person or corporation" was consistent with the broad definition of "person" found

---

[3] The business organizations code defines "corporation" as "an entity governed as a corporation under Title 2 or 7." TEX. BUS. ORGS. CODE ANN. § 1.002(14) (West, Westlaw through 2017 1st C.S.). The same section defines "limited liability company" as "an entity governed as a limited liability company under Title 3 or 7." *Id.* § 1.002(46); *see Greco v. Nat'l Football League*, 116 F.Supp.3d 744, 749 (N.D. Tex. 2015) (relying on these definitions to hold that an LLC did not qualify as an "individual or corporation" from which attorney's fees could be collected).

in the code construction act. *See* TEX. GOV'T CODE ANN. § 311.005(2). First Cash contends that during the 1985 recodification, the phrase "person or corporation" was changed to "individual or corporation" with the sole purpose of preventing governmental units from being held liable for attorney's fees. Thus, First Cash reasons that "individual or corporation" means all of the entities mentioned in the code construction act's definition of "person"—a "corporation, organization, . . . business trust, estate, trust, partnership, association, and any other legal entity"—except governmental entities. *See id.* However, our reading of the statute's legislative history does not favor this conclusion.

First Cash is correct that early cases dealing with this area of law primarily focused on whether government defendants would be liable for attorney's fees. Under the predecessor statute's phrase "person or corporation," the term "person" would have in theory been broadly defined under the code construction act to include virtually any form of legal entity, including units of government. *See Thomas v. Hale Cty.*, 531 S.W.2d 213, 215 (Tex. Civ. App.—Amarillo 1975, no writ). However, Texas courts were reluctant to allow plaintiffs to collect attorney's fees from the government under article 2226, the predecessor statute. The Tyler Court of Appeals disregarded the broad definition of "person" in the code construction act and instead applied a plain language definition to the word "person" in article 2226; because the defendant-county did not qualify as "an individual human being," the plaintiff could not collect attorney's fees. *See Comm'rs Court of Houston Cty. v. Rodgers*, 691 S.W.2d 753, 757 (Tex. App.—Tyler 1985, no writ). Similarly, the Austin Court of Appeals disregarded the code construction act's definition of "person" and instead held that the city defendant's status under article 2226 was controlled by the word "corporation," triggering the traditional rule that "[u]nless the statute

9

expressly provides that municipalities shall be included within the scope of the word 'corporation,' they may not be included therein by construction." *City of Austin v. N. Austin State Bank*, 631 S.W.2d 564, 568 (Tex. App.—Austin 1982, no writ). Because article 2226 did not expressly make municipalities liable for attorney's fees as a corporation, the city was not liable for attorney's fees. *See id.* at 569.

However, at least one court disagreed and held that a county qualified both as a "person" and a "corporation" under the attorney's fees statute, and the plaintiff could therefore collect attorney's fees from the county. *Wickersham Ford, Inc. v. Orange Cty.*, 701 S.W.2d 344, 348–49 (Tex. App.—Beaumont 1985, no writ).

Following these cases (and likely in response to them), the Legislature recodified the statute in 1985. The Legislature replaced the phrase "person or corporation" with "individual or corporation," and included a revisor's note which explained that section 38.001 "does not use 'person' in the reference to an opposing party because the Code Construction Act definition of 'person' is broader than the source law meaning of the term." *Lake LBJ*, 839 S.W.2d at 891 n.9. The revisor's note further explained that the statutory alteration was "'intended as a recodification only, and no substantive change in the law' was intended." *Id.* at 891.

In 1992, the Austin Court of Appeals revisited this issue and held that a plaintiff could not collect attorney's fees from a governmental unit under recodified section 38.001. *Id.* at 891–94. The Austin court adopted a "plain language" interpretation and held that "individual" referred to a natural person, not a governmental unit. *Id.* at 891. The Beaumont Court of Appeals soon reached the same conclusion. *Base-Seal, Inc. v. Jefferson Cty.*, 901 S.W.2d 783, 786 (Tex. App.—Beaumont 1995, writ denied). The

10

plain language interpretation that was adopted in these opinions suggests that attorney's fees could not be collected from LLCs, which had recently been permitted as Texas domestic entities in 1991. *See Shook v. Walden*, 368 S.W.3d 604, 613 (Tex. App.—Austin 2012, pet. denied). However, with the exception of one federal district court, no court applied this interpretation to prevent awards of attorney's fees against LPs, LLCs, or LLPs in the twenty-five years that followed the recodification. *See Ganz v. Lyons P'ship, LP*, 173 F.R.D. 175–76 (N.D. Tex. 1997).

In *Fleming & Associates, LLP v. Barton*, the Houston Fourteenth Court of Appeals became the first Texas state court to hold that LLPs could not be held liable for attorney's fees under the plain meaning of section 38.001. *See* 425 S.W.3d at 576 (citing *Ganz*, 173 F.R.D. at 176). Since the issuance of *Fleming*, state courts[4] and federal courts[5] have unanimously adopted this rule and extended it to LLCs. *See Alta Mesa*, 488 S.W.3d at 453 (applying the rule of *Fleming* to LLCs).

From this history, we draw multiple conclusions which suggest that First Cash's interpretation is inaccurate. For one, the code construction act's broad definition of "person" did not control the predecessor statute. The predecessor statute provided that

---

[4] *See Choice! Power, LP v. Feeley*, 501 S.W.3d 199, 214 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *see also 8305 Broadway Inc. v. J & J Martindale Ventures, LLC*, No. 04-16-00447-CV, 2017 WL 2791322, at *5 (Tex. App.—San Antonio June 28, 2017, no pet.) (mem. op.); *CBIF LP v. TGI Friday's Inc.*, No. 05-15-00157-CV, 2017 WL 1455407, at *25 (Tex. App.—Dallas Apr. 21, 2017, pet. filed) (mem. op.); *EXCO Operating Co., LP v. McGee*, No. 12-15-00087-CV, 2016 WL 4379484, at *2 (Tex. App.—Tyler Aug. 17, 2016, no pet.) (mem. op.).

[5] *Hoffman v. L & M Arts*, 838 F.3d 568, 583 n.14 (5th Cir. 2016) (suggesting that the district court's denial of attorney's fees was justified by the plain language of the statute, citing *Choice! Power*, 501 S.W.3d at 214); *Taylors Int'l Servs., Inc. v. Cuero Oilfield Hous., LLC*, No. A-16-CA-512-SS, 2016 WL 8674349, at *1 (W.D. Tex. Oct. 31, 2016) (order) ("There is no logic to the law eliminating attorney's fees [as to LLCs], but that is exactly what Texas has done."); *Solid Sys. CAD Servs. v. Total Risc Tech., Ltd.*, No. 4:12-CV-03176, 2016 WL 5942935, at *3 (S.D. Tex. Oct. 13, 2016); *Traxxas, LP v. Dewitt*, No. 4:14CV733, 2015 WL 7777986, at *7 (E.D. Tex. Dec. 2, 2015) (magistrate's mem. op.), *adopted*, No. 4:14CV733, 2016 WL 6879604, at *1 (E.D. Tex. Nov. 22, 2016); *Greco*, 116 F.Supp.3d at 749.

11

"[a]ny person, *corporation, partnership, or other legal entity*" could recover attorney's fees from "a person *or corporation.*" *Lake LBJ*, 839 S.W.2d at 890 (some emphasis in original). Applying an all-encompassing definition of "person" would render the terms "corporation," "partnership," and "other legal entity" a meaningless surplus. *See Randol Mill*, 465 S.W.3d at 617; *Alta Mesa*, 488 S.W.3d at 454–55 (applying similar reasoning). Rather, as the revisor's note for the recodification explained, the "broad[]" definition of person simply did not apply to the predecessor statute. *Lake LBJ*, 839 S.W.2d at 891 n.9. Under this reading, "person or corporation" plainly referred to a natural human being or an actual corporation. *See Comm'rs Court of Houston Cty.*, 691 S.W.2d at 757; *City of Austin*, 631 S.W.2d at 568.

The revisor's note further explained that section 38.001 was intended to embody the same substantive meaning as the predecessor statute. *Lake LBJ*, 839 S.W.2d at 891. To determine whether this general statement of legislative intent holds true, we must assess whether section 38.001 is "unambiguous[ly]" different from its predecessor, such that it "cannot be reconciled with prior law." *See Fleming Foods*, 6 S.W.3d at 286. Do any of First Cash's remaining arguments demonstrate such a clear departure? We think they do not.

First Cash argues that the phrase "individual or corporation" has been regularly used in other statutes to denote the general power to sue and be sued and to make contracts. For instance, section 3.01 of the now-repealed Texas Revised Partnership Act provided that a "partnership has the same powers as an individual or corporation to do all things necessary or convenient to carry out its business and affairs," including the power to make contracts, and to sue and be sued. *See Tooke v. City of Mexia*, 197

12

S.W.3d 325, 353 (Tex. 2006). First Cash's view would dovetail with the attorney's fees statute, which directly relates to suing and making contracts. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8). Based on these comparable uses, First Cash asserts that the phrase "individual or corporation" has acquired a particular meaning: it refers to any legal entity with the power to sue, to be sued, and to make contracts—except units of government. We disagree.

This reasoning is incompatible with the plain language of both the current and former statutes. The predecessor statute made attorney's fees available to "[a]ny person, corporation, partnership, or *other legal entity*," but made attorney's fees available from a "person or corporation." *Lake LBJ*, 839 S.W.2d at 890 (some emphasis in original). First Cash asserts that "person or corporation" roughly means any legal entity, but the Legislature had little reason to rely on the phrase "person or corporation" as a separate and less clear means of referring to the same concept that was expressly mentioned just six words earlier. *See id.* Similarly, the current statute makes attorney's fees available *to* a "person," as that term is broadly defined under the code construction act, but makes such fees available *from* an "individual or corporation." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8). The Legislature clearly knew how to make attorney's fees available *to* all legal entities, but intentionally chose not to make them available *from* all legal entities. *See Cadena*, 518 S.W.3d at 325–26.

First Cash's reasoning is also incompatible with the state of organizational law in 1985. The phrase "individual or corporation" could not have served as a generic reference to all domestic entities in 1985 because the phrase did not account for partnerships, which had long been recognized as legal entities with an identity distinct

13

from their partners, and with the powers to sue, to be sued, and to enter contracts. *See In re Allcat Claims Serv., LP*, 356 S.W.3d 455, 463 (Tex. 2011) (orig. proceeding) (noting that Texas has regarded partnerships as formal legal entities—rather than aggregates of individuals—at least since the adoption of the uniform partnership act in 1961); *see also Taormina Corp. v. Escobedo*, 254 F.2d 171, 174 (5th Cir. 1958).

Finally, other comparable uses of the phrase "individual or corporation" undercut First Cash's interpretation. Around the same time as the recodification of the attorney's fees statute, the Legislature enacted revisions to another statute related to contract formation. *See generally* TEX. PROP. CODE ANN. § 53.026 (West, Westlaw through 2017 1st C.S.). Prior to 1989, this provision contained a number of references to "a corporation or individual" and "an individual or corporation," but a 1989 amendment replaced each of these instances with the statutory term "person" to ensure the broadness of this provision. *See* Act of June 16, 1989, 71st Leg., R.S., ch. 1138, § 3, 1989 Tex. Gen. Laws 4694. This reinforces our presumption that the Legislature chooses each word in a statute for a purpose: just as the Legislature intentionally substituted "person" into this section of the property code to ensure that it would reach all legal entities, the Legislature deliberately replaced "person" in the predecessor statute with "individual or corporation" to ensure that only those specified legal entities would be liable for attorney's fees. *See Cadena*, 518 S.W.3d at 325–26. First Cash's argument concerning comparable usage of this phrase is unavailing.

We conclude that the recodified statute does not present a direct and unambiguous departure from the prior statute. *See Fleming Foods*, 6 S.W.3d at 286. When interpreted according to its plain language, section 38.001 can readily be reconciled with

cases construing the predecessor statute to have the same plain meaning: in a breach of contract case, attorney's fees may only be assessed against a natural person or an actual corporation. *See Comm'rs Court of Houston Cty.*, 691 S.W.2d at 757; *City of Austin*, 631 S.W.2d at 568.

The trial court granted JNOV denying the attorney's fees which the jury assessed against the Legacy Landlord LLCs. A JNOV is correctly granted if a legal principle precludes recovery. *Daftary*, 404 S.W.3d at 814. The legal principles embodied in the plain language of the statute bar recovery of attorney's fees against an LLC. *See id.* We therefore conclude that the trial court correctly granted JNOV. *See id.*

We overrule First Cash's first issue.

### III. CONVERSION

By its second issue, First Cash contends that the trial court erred in granting directed verdict in favor of the Current Landlords on the basis that they were not liable for the Legacy Landlords' obligations. First Cash asserts the Current Landlords are simply a reorganized or converted form of the Legacy Landlords, and therefore the Current Landlords are liable to the same extent as the Legacy Landlords. First Cash asserts that when the Legacy Landlords transferred their interest in Parkdale to the Current Landlords, the four entities that make up the Legacy Landlords (all LLCs) were converted into the two entities that make up the Current Landlords (a corporation and an LP). Accordingly, First Cash reasons that the Current Landlords are successors to all liabilities of the Legacy Landlords.

A domestic entity may convert into a different type of domestic entity or a non-code organization by adopting a plan of conversion. TEX. BUS. ORGS. CODE ANN. § 10.101(a)

15

(West, Westlaw through 2017 1st C.S.). A plan of conversion must be in writing and must fulfill certain requirements. *Id.* § 10.103(a) (West, Westlaw through 2017 1st C.S.).

First Cash does not direct our attention to any formal plan of conversion. Instead, First Cash's conversion argument rests entirely on a single line of testimony by Richard Runde, a co-owner of the Landlords:

> Counsel for First Cash: And then in January, 2010, about the time you got this deal with Walmart, you guys converted your ownership to a limited partnership, correct?
>
> Runde: Yes, sir.

First Cash's argument bears no relation to section 10.101 of the Business Organizations Code, which does not provide that a formal organizational change may be accomplished by a witness's description of the organization in trial testimony. *See id.* § 10.101. First Cash's second issue is overruled.

## IV. CROSS-APPEAL ON DAMAGES

By their first issue on cross-appeal, the Legacy Landlords assert that there was insufficient evidence to support the jury's award of $182,400 to compensate First Cash for the "rent differential," a measure of damages designed to approximate the lost value of its breached lease. By their second issue, the Legacy Landlords challenge the jury's award of $130,000 for the cost of relocating and refinishing a new location for First Cash's pawn shop.

## A. Applicable Law

We review a legal sufficiency challenge under the same no-evidence standard described above. *Akin, Gump, Strauss, Hauer & Feld, LLP v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009).

16

The goal in measuring damages for a breach-of-contract claim is to provide just compensation for any loss or damage actually sustained as a result of the breach. *Parkway Dental Assocs., PA v. Ho & Huang Props., LP*, 391 S.W.3d 596, 607 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also Bus. Prod. Supply v. Marlin Leasing Corp.*, No. 13-11-00371-CV, 2013 WL 7141350, at *25 (Tex. App.—Corpus Christi Aug. 29, 2013, pet. denied) (mem. op.). The normal measure of damages in a breach-of-contract case is the expectancy or benefit-of-the-bargain measure. *Parkway Dental*, 391 S.W.3d at 607. The purpose of this measure of damages is to restore the injured party to the economic position it would have occupied had the contract been performed. *Id.*

Where the leaseholder is evicted in breach of the lease, one potential measure of the leaseholder's expectancy damages is the rent differential, which is the difference between (1) the agreed rent and (2) the actual market rental value of the remaining lease term. *Design Ctr. Venture v. Overseas Multi-Projects Corp.*, 748 S.W.2d 469, 473 (Tex. App.—Houston [1st Dist.] 1988, writ denied); *see also Fryer v. Cantu*, No. 13-97-460-CV, 1999 WL 33320965, at *3 (Tex. App.—Corpus Christi Aug. 5, 1999, no pet.) (op.). This measure of damage quantifies the benefit of the leaseholder's bargain: the value of any financial advantage that the leaseholder possessed by holding the rights to a lease that was worth more than what the leaseholder was required to pay. *See Design Ctr.*, 748 S.W.2d at 473.

In the context of purchasing real property, "market value" has been defined as "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001).

17

Texas recognizes three approaches to determining the market value of property, and the approach most relevant here is the comparable sales approach. *Id.* Under this approach, the value of the property is determined by comparison to sales of similar properties, adjusting for any dissimilarity. *Id.*

An unaccepted offer to sell is not competent evidence of market value. *See Hanks v. Gulf, Colo. & Santa Fe Ry. Co.*, 320 S.W.2d 333, 336–37 (Tex. 1959); *Sw. Bell Tel. Co. v. Wilson*, 768 S.W.2d 755, 762 (Tex. App.—Corpus Christi 1988, writ denied); *see also City of Dallas v. Malloy*, 214 S.W.2d 154, 156 (Tex. Civ. App.—El Paso 1948, writ dism'd) (applying this rule in the context of a lease). Courts have found this evidence "too uncertain, shadowy, and speculative" to be admissible as a measure of market value. *Hanks*, 320 S.W.2d at 337 (quoting *Sharp v. United States*, 191 U.S. 341, 348–49 (1903)); *Lee v. Lee*, 47 S.W.3d 767, 785 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

In addition to the rent differential, the tenant may recover consequential damages, also called special damages. *Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 901 (Tex. 2011). Consequential damages are those damages that result naturally, but not necessarily, from the defendant's breach. *Id.* Consequential damages are recoverable if the parties contemplated at the time they made the contract that such damages would be a probable result of the breach.[6] *Id.*; *see Charalambous v. Jean Lafitte Corp.*, 652 S.W.2d 521, 526 (Tex. App.—El Paso 1983, writ ref'd n.r.e.) (upholding award for expenses of moving an evicted party's business to another location

---

[6] Thus, to be recoverable, consequential damages must be foreseeable and directly traceable to the wrongful act and result from it. *Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 901 (Tex. 2011). On appeal, the Legacy Landlords do not challenge the foreseeability of First Cash's consequential damages.

18

as foreseeable); *Briargrove Shopping Ctr. Joint Venture v. Vilar, Inc.*, 647 S.W.2d 329, 335–36 (Tex. App.—Houston [1st Dist.] 1982, no writ) (same); *see also Lazell v. Stone*, 123 S.W.3d 6, 12 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (op. on reh'g); *Fryer*, 1999 WL 33320965, at *3.

## B.    Rent-Differential Damages

To determine First Cash's expectancy damages, the charge asked the jury to find the rent differential between (1) First Cash's rent under the lease and (2) the actual market value of the remaining lease term.

At trial, First Cash asserted that the differential between market value and rent was $7.60 per square foot per year ("sq.ft./year").[7]   Instead, the jury returned a broad-form answer that the total rent differential was $182,400, which translates to a differential of $3.06 sq.ft./year.

On appeal, the parties apparently agree that First Cash's rent at Parkdale was $10.16 sq.ft./year at the time of breach, which establishes the value of the first element of the rent differential.   However, the Legacy Landlords contend that there is insufficient evidence to support the second element:   the market value of the remaining term of the lease.   To support the jury's award of $3.06 sq.ft./year for the yearly differential, there must be sufficient evidence that the market value of the lease was at least $3.06 sq.ft./year greater than the agreed rent of $10.16 sq.ft./year—that is, evidence that the market value of the lease was $13.22 sq.ft./year or more.

---

[7] When this yearly differential of $7.60 sq.ft./year is multiplied by First Cash's 5,000 square-foot leasehold, as well as by the roughly eleven years and eleven months remaining on the lease at the time of breach, First Cash's estimate for the total rent differential was approximately $452,800.

The jury heard several forms of evidence related to the value of the lease. The witnesses were in accord that after First Cash's eviction and the completion of the Walmart redevelopment project, the value of Parkdale's commercial space increased substantially. For example, the jury heard testimony that prior to the Walmart redevelopment, First Cash's building at Parkdale was of poor quality and its parking area was filled with pot holes. However, Richard Runde and Jerry Quick, who are the co-owners of both Landlords, both agreed that the quality of their facilities improved following the completion of the redevelopment, and Quick testified that the addition of Walmart brought significantly more traffic into the shopping center. Quick agreed that the new Parkdale commercial space "fetche[d] a lot higher rent" than it had previously, and Runde testified similarly. Quick elaborated that since the Walmart redevelopment, the Landlords had offered space in Parkdale for between $14 and $18 sq.ft./year, though he attested that he had not been able to successfully lease space at the rate of $18 sq.ft./year. More generally, Quick testified that as of March 2010, the average asking price for commercial real estate in Corpus Christi was "about $15." By comparison, Quick further testified that First Cash paid $9.70 sq.ft./year in rent at its new location roughly a mile away, which he viewed as a "fabulous" deal for First Cash.

The jury also heard testimony that following the Legacy Landlords' breach of the lease, the Landlords negotiated with First Cash to lease space in the redeveloped shopping center, but that the Landlords' demand for higher rent led First Cash to look elsewhere. Chris Lee, the vice president of operations for First Cash, testified that in 2007, prior to the fire, he had discussions with Quick concerning the Landlords' plan to redevelop the shopping center. Quick and Lee explored several options wherein the

20

Landlords would pay to accommodate First Cash during construction—e.g., temporarily moving their pawn shop into another building at Parkdale or a vacant commercial space nearby—but this plan proved inviable because the rent at all suitable alternate locations was too high for First Cash. Lee further testified that in planning to permanently move First Cash back into a new Parkdale building, the Landlords demanded a significantly higher price, with half the space for the same amount of rent First Cash originally paid—which, taken literally, would translate to roughly $16 sq.ft./year.

Ultimately, the Landlords' demand for higher rent caused First Cash to look elsewhere. Lee further testified that due to regulations on pawn shops, the available locations for its new store were restricted to those within a mile of its prior location at Parkdale. Lee testified that $16 per square foot was "market base rent" in that one-mile radius of possible locations.

The great majority of this evidence concerned "asking" and "offering" prices, which, as unaccepted offers to sell, was not competent evidence of market value. *See Hanks*, 320 S.W.2d at 336–37; *Sw. Bell Tel. Co.*, 768 S.W.2d at 762. For instance, while Quick and Lee thoroughly discussed the rental rates at Parkdale, they referred to the rental rates only in terms of the Landlords' asking price, and none of their testimony referred to values of actual transactions. Just the opposite, Quick clarified that he was never able to obtain the asking price of $18 sq.ft./year, and he never specified what rates he actually was able to obtain. Similarly, Lee professed that $16 sq.ft./year was "market base rent" in the eligible one-mile radius of alternate locations, but his testimony made clear that he was referring to his consultation with other landlords about their asking prices, and not to consummated leases.

Instead, the only completed rental transaction that any witness discussed was First Cash's entry into a lease at their new location. Quick testified that under the new lease, First Cash paid $9.70 sq.ft./year in rent, which he viewed as a "fabulous" deal for First Cash. No further effort was made to quantify just how "fabulous" it was. This value— some unknown figure that was greater than $9.70 sq.ft./year—is insufficient to support the jury's finding that the market value of First Cash's lease was at least $3.06 sq.ft./year more than the base rent of $10.16 sq.ft./year. Accordingly, we sustain the Legacy Landlords' first issue.

However, while there was no competent evidence to support a specific market value, there was undisputed evidence that market value was significantly higher than the amount of rent that First Cash owed under the lease. Thus, the breach of the lease undoubtedly resulted in some rent-differential damages, but the evidence is simply insufficient to support the full and specific amount awarded by the jury. When "there is some evidence of damages, but not enough to support the full amount, it is inappropriate to render judgment." *Akin*, 299 S.W.3d at 124; *see Playboy Enters., Inc. v. Editorial Caballero, SA de CV*, 202 S.W.3d 250, 271–72 (Tex. App.—Corpus Christi 2006, pet. denied). As more fully set out in the Conclusion section, *infra*, we will remand for a new trial concerning First Cash's claim for rent-differential damages.

## C.    Build-Out Damages

By their second issue on cross-appeal, the Legacy Landlords challenge the jury's award of $130,000 as breach-of-lease damages for the cost to build out First Cash's new location. Again, the Legacy Landlords do not dispute that they breached the lease, or that this breach caused First Cash to actually spend the sum of $130,000 to make its new

location suitable for use as a pawn shop. Rather, according to the Legacy Landlords, First Cash was required to demonstrate that this sum was the "reasonable and necessary" cost of constructing the pawn shop, and First Cash failed to introduce any such evidence.

As support, the Legacy Landlords cite multiple cases involving breaches of construction contracts, wherein the breaching party had agreed to build improvements on real property. *See McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012) (per curiam); *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 200–201 (Tex. 2004) (per curiam); *City of Alton v. Sharyland Water Supply Corp.*, 402 S.W.3d 867, 876 (Tex. App.— Corpus Christi 2013, pet. denied). In those cases, the party complaining of the breach may pursue one of two measures of damages: "remedial damages," which is the cost to complete or repair less the unpaid balance on the contract price, and "difference-in-value damages," which is the difference between the value of the building as it is constructed and its value had it been constructed according to the contract. *McGinty*, 372 S.W.3d at 627. The Legacy Landlords cite the rule that a party seeking to recover the "remedial" measure of damages for breach of a construction contract "must prove that the damages sought are reasonable and necessary." *Id.*

The cases the Legacy Landlords rely on do not apply here. The jury found that the Legacy Landlords breached a lease contract, not a construction contract, and the jury awarded damages to permit First Cash to build out a pawn shop, not remedial damages to complete or repair a defectively constructed pawn shop. *See id.* We find no case applying the "reasonable and necessary" requirement of *McGinty* to an action for breach of lease. *See id.*

23

Accordingly, the Legacy Landlords' argument is without merit. We overrule the Legacy Landlords' second issue.

## V.  CONCLUSION

We affirm the trial court's rendition of JNOV denying attorney's fees. We affirm the award of $130,000 as damages for built-out costs. We also affirm the trial court's grant of directed verdict in favor of the Current Landlords.

Because the evidence established that some rent-differential damages occurred as a result of the breach of lease, but was insufficient to support the specific amount awarded by the jury, we reverse the award of $182,400 in rent-differential damages. We remand the matter for a new trial on both liability and rent-differential damages on First Cash's claim against the Legacy Landlords for breach of lease. *See* TEX. R. APP. P. 44.1.[8]

NELDA V. RODRIGUEZ
Justice

Delivered and filed the 11th
day of January, 2018.

---

[8] Texas Rule of Appellate Procedure 44.1 provides that if liability is contested, an appellate court may not order, on remand, a separate trial solely on unliquidated damages. TEX. R. APP. P. 44.1. If a party files a general denial in the trial court, liability is considered contested under the meaning of Rule 44.1. *Estrada v. Dillon*, 44 S.W.3d 558, 562 (Tex. 2001) (per curiam). This remains true even when the appellant only challenges damages on appeal and does not bring a "discrete challenge to liability." *Id.* Because the Legacy Landlords filed a general denial in the trial court, we may not remand for a new trial solely on the issue of damages. *See id.*

24