**Motion for Rehearing Denied; Memorandum Opinion of April 19, 2022 Withdrawn; Petition for Writ of Mandamus Conditionally Granted; and Substitute Memorandum Opinion filed July 26, 2022.**



In The

# Fourteenth Court of Appeals

---
### NO. 14-21-00337-CV
---

## IN RE BREITBURN OPERATING LP, SUCESSOR-IN-INTEREST TO QRE OPERATING, LLC, BREITBURN MANAGEMENT COMPANY, LLC, BREITBURN ENERGY PARTNERS, LP, QR ENERGY, LP, AND MAVERICK NATURAL RESOURCES, LLC, Relators

**ORIGINAL PROCEEDING**
**WRIT OF MANDAMUS**
**133rd District Court**
**Harris County, Texas**
**Trial Court Cause No. 2015-47031**

### SUBSTITUTE MEMORANDUM OPINION

On June 18, 2021, relators Breitburn Operating LP, sucessor-in-interest to QRE Operating, LLC, Breitburn Management Company, LLC, Breitburn Energy Partners, LP, QR Energy, LP, and Maverick Natural Resources, LLC (collectively, "Breitburn") filed a petition for writ of mandamus in this court. *See* Tex. Gov't Code Ann. § 22.221; *see also* Tex. R. App. P. 52. In the petition, relator asks this court to compel the Honorable Jaclanel McFarland, presiding judge of the 133rd District Court of Harris County, to set aside her May 20, 2021 order directing Breitburn to deposit over $13.4 million dollars into the registry of the court. We conditionally grant the petition.[1]

## BACKGROUND

In June 1983, the Louisiana Land and Exploration Company ("LLEC") created the LL&E Trust (the "Trust"). LLEC and the Trust then created the LL&E Royalty Partnership (the "Partnership"). The Trust had a 99% interest in the Partnership and LLEC had a 1% interest and was the managing general partner. The Partnership was formed for the purpose of receiving and holding the overriding royalty interests, receiving proceeds from the overriding royalty interests, paying the liabilities and expenses of the Partnership, and disbursing remaining revenues to the Trust and managing general partner.

On June 28, 1983, LLEC entered into substantially identical agreements known as "Conveyance Overriding Royalty Interests" (collectively, the

---

[1] We deny the motion for rehearing filed by real party in interest Roger D. Parsons, in his Capacity as Trust of the LL&E Royalty Trust, withdraw our memorandum dated April 19, 2022, and issue this substitute opinion.

"Conveyance"), which varied only in the interests covered, with the Partnership. One of the oil and gas properties in which LLEC owned mineral interests at the time of the Conveyance was the Jay Field, which is located in Alabama and Florida. The assignor that owns the working interest in the Jay Field, is responsible for overseeing the operation of the Jay Field, and sells oil and gas from the Jay Field. LLEC, as assignor, conveyed to the Partnership, as assignee, the right to receive "Net Proceeds," as defined in the Conveyance associated with LLEC's mineral interests. Net Proceeds are the proceeds net of Production Costs, which are associated with maintaining the Jay Field. Production Costs are deducted from the Gross Proceeds.

Through a series of acquisitions, ConocoPhillips Company became LLEC's successor as managing general partner of the Partnership. Quantum Resources Management, LLC purchased the working interests in the Jay Field in December 2006 and became the operator of the Jay Field in April 2007. In 2012, Quantum Resources transferred its working interests operations in the Jay Field to QRE Operating, LLC, the subsidiary of QR Energy, LLC. Thereafter, on November 19, 2014, QR Energy merged into and became a subsidiary of Breitburn Energy Partners, LLP. Thus, Breitburn Operating LP ("Breitburn") became the assignor and the operator of the Jay Field and acquired a working interest in the Jay Field.

From 1983 to 2006, LLEC paid the Partnership over $300,000,000 in Net Proceeds from the Jay Field, which averaged a little over $13,000,000 a year. The Partnership has not received any payments under the Conveyance nor has the assignor paid any money to the Partnership since 2008.

3

The Conveyance allows the assignor to set aside funds for future costs or "Special Costs," which include such as items as the estimated costs of plugging and abandoning wells on the property and estimated future capital expenditures on the property. Such Special Costs are not born by the Partnership, but by Breitburn, the assignor. The assignor may put the funds to cover the Special Costs into a Special Cost Escrow Account pursuant to the Conveyance. The Conveyance provides that "Assignor may, in its sole discretion, elect to refrain from actually placing funds in escrow but nevertheless calculate and pay amounts attributable to the Overriding Royalty Interest as if funds had been placed in escrow . . . ."

On April 14, 2014, counsel for the Trust wrote Quantum Resources Management and QR Energy (collectively, "Quantum").[2] The Trust questioned Quantum's failure to pay the Trust "tens of millions of dollars in royalties due to the Trust under the terms of the parties' written agreements," noting that the last recurring overriding royalty interest payment occurred prior to April 2007 and a single nonrecurring payment was made in September 2008. The Trust alleged that Quantum was making payments to the Special Cost Escrow Account instead of making its contractually obligated royalty payments to the Trust.

The Trust alleged that Quantum had breached the Conveyance by (1) refusing to make the overriding royalty interest payments to the Trust for over seven years, (2) increasing the amount of the Special Cost Escrow Account by approximately $40 million in the previous three years, while refusing to make any royalty payments to

---

[2] In the correspondence, counsel does not refer to the Trustee but the Trust instead.

4

the Trust, and (3) holding the Special Cost Escrow Account funds in an internal Quantum account rather than with an independent escrow agent. The Trust demanded that Quantum (1) pay the Trust its portion of the Special Cost Escrow account (50% of the total balance), (2) begin making monthly overriding royalty interest payments to the Trust, and (3) transfer the entirety of the balance of the Special Cost Escrow account from the internal Quantum account to an account controlled by an independent escrow agent. The Trust concluded by suggesting that the parties meet to discuss the issues raised in the letter, or it would pursue its legal rights.

Quantum's counsel responded to the Trust's April 14, 2014 correspondence and asserted that Quantum had complied with each of the provisions of the Conveyance. Quantum stated that the Jay Field, as recognized in the Trust's correspondence, was shut down in the latter part of 2008 and through 2009. Quantum averred that the shutdown was not because of an intent to avoid its obligations to the Trust under the Conveyance but instead was necessitated due to crude oil prices being significantly below the operating cost of the Jay Field on a per barrel basis.

Moreover, according to Quantum, capital improvements were made in 2009 so that the Jay Field would again operate profitably. Quantum asserted that the success of such improvements was evidenced by the continued increase in production and revenue. Quantum stated the Trust's portion of capital improvement was contributed by Quantum. This created an Excess Production Cost balance and the Trust would begin receiving royalty payments once the Excess Production Cost

balance was paid down. Quantum agreed that an independent escrow agent should be used to steward the Special Cost Escrow account and, therefore, established an account at Wells Fargo Bank with a deposit of $18,051,909.

In October 2014, the Trust filed a complaint in the United States District Court for the Eastern District of Michigan against Quantum, alleging breach of the Conveyance, fraud, statutory conversion, breach of fiduciary duty, and violation of the Racketeer Influenced and Corrupt Organizations Act, seeking injunctive relief, and the appointment of a receiver over the financial operations of the Jay Field. On July 15, 2014, the federal court dismissed the Trust's complaint for lack of subject matter jurisdiction.

On August 12, 2015, Quantum filed a petition for declaratory judgment against Roger D. Parsons, in his capacity as Trustee of the Trust. The purpose of the declaratory judgment action is to determine the rights and obligations arising from the Conveyance to which Quantum and "the LL&E Royalty Trust (the "Texas Trust") are parties."

About six months later, on February 16, 2016, Parsons filed an original counterclaim and third-party petition, alleging that Quantum and its successor, Breitburn, had breached the Conveyance for failure to properly calculate and pay net proceeds.

Quantum and Breitburn filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York on May 15, 2016. Parsons requested that the bankruptcy court lift the automatic bankruptcy stay to pursue the

underlying case. On April 14, 2017, the bankruptcy court granted relief from the stay to allow the Texas courts to determine the rights of the parties under the Conveyance.

On September 13, 2019, Parsons filed a third amended answer, amended counterclaim and amended third-party petition against Quantum, adding ConocoPhillips as a party. Parsons alleged that ConocoPhillips, as general partner of the Partnership, had not taken any steps to protect the royalty interests or ensure compliance with the contractual terms of the Conveyance. On December 20, 2019, Breitburn filed a second verified amended answer, asserting that "The Trust is not entitled to recover in the capacity in which it sues."

On April 12, 2021, Breitburn notified the Partnership that it intended to withdraw the funds in the Wells Fargo account and close the account effective April 15, 2021. Breitburn explained that the amount in the Wells Fargo account was funded to an amount of money that equaled 50% of the Special Costs Escrow Account at the time it was created. The account balance, which was $19,085,585.38, exceeded the 50% amount of the Special Costs Escrow Account of $14,811,984.78. Therefore, Breitburn was withdrawing funds from the Wells Fargo account to reimburse itself for Special Costs it previously had incurred and to reconcile the balance in the Wells Fargo account to an amount equal to 50% of the Special Costs Escrow Account balance.

Parsons filed an emergency application for an order compelling the deposit of the Wells Fargo account into the court's registry or, alternatively, for a temporary restraining order prohibiting Breitburn from liquidating or drawing down the

7

account. After a hearing on April 29, 2021, at which counsel for Parsons and counsel for Breitburn were present, the trial court signed a temporary restraining order and show cause order, prohibiting Breitburn from liquidating or drawing down the Wells Fargo account.

On May 12, 2021, Parsons filed an application for an order compelling the deposit of the Special Cost Escrow into the court's registry or, alternatively, for a temporary injunction prohibiting Breitburn from liquidating or drawing down the account. The trial court held a hearing on the application on May 14, 2021, and orally announced that it was ordering Breitburn to deposit $13,400,000 into the court's registry and granting the temporary injunction, The trial court signed the order on May 20, 2021.[3] Breitburn deposited the $13,400,000 into the registry of the court of May 27, 2021.

In this mandamus proceeding, Breitburn asks this court to compel the trial court to vacate its May 20, 2021 order for deposit into the registry of the court. Breitburn brings three issues: (1) the Trust does not have the capacity to recover the funds in the court's registry; (2) none of the disputed funds were proceeds from the sale of oil and gas; (3) the trial court did not satisfy the requirements for ordering a pretrial deposit. Because the first issue is dispositive, we do not address the second or third issues.

---

[3] In the same order, the trial court issued a temporary injunction prohibiting Breitburn from closing, liquidating, or depleting the Wells Fargo account. The temporary injunction is not part of the mandamus proceeding but is pending in an appeal in case number 14-21-00310-CV.

8

To obtain mandamus relief, a relator generally must show both that the trial court clearly abused its discretion and that the relator has no adequate remedy by appeal. *In re Dawson*, 550 S.W.3d 625, 628 (Tex. 2018) (orig. proceeding) (per curiam); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. proceeding). A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to analyze the law correctly or apply the law correctly to the facts. *In re H.E.B. Grocery Co., L.P.*, 492 S.W.3d 300, 302–03 (Tex. 2016) (orig. proceeding) (per curiam); *In re Cerberus Capital Mgmt. L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding) (per curiam). Orders compelling a prejudgment deposit into the registry of the court are properly reviewed on mandamus because a relator does not have an adequate remedy by appeal. *In re Warrior Energy Servs. Corp.*, 509 S.W.3d 110, 118–19 (Tex. App.—14th Dist.] 2020, orig. proceeding).

## ANALYSIS

### Abuse of Discretion

When all the dust settles from all the various acquisitions, transfers, assignments, and mergers, we are left with a relatively simple business structure. The LL&E Royalty Partnership has two partners: (1) the LL&E Royalty Trust, a non-managing general partner; and (2) ConocoPhillips, the managing general partner. Parsons is the trustee of the LL&E Royalty Trust.

Breitburn contends that Parsons lacks capacity to pursue the Special Account Escrow funds. Instead, without conceding that any party other than Breitburn is entitled to the funds, Breitburn asserts that only the Partnership, which is the assignee under the Conveyance, has capacity to sue for the funds.

A party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy. *Nootsie, Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996). The issue of capacity "is conceived as a procedural issue dealing with the personal qualifications of a party to litigate." *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005) (internal quotation marks & citation omitted).

The Partnership is not a party to the case. Parsons's counterclaim made clear that he was the party seeking damages. Parsons listed himself as "Defendant/Counter-Plaintiff/Third Party Plaintiff" in his counterclaim and third-party petition and repeatedly referred to himself as the party bringing claims against Breitburn, among others, and seeking damages. Parsons alleged the following, in part:

> 3.13. This case involves the breach of certain contractual and fiduciary duties owed to the LL&E Trust with respect to the LL&E Trust's real property interests. The Counter-Defendant and Third-Party Defendants conspired to, among other things, refuse to pay certain oil and gas royalties owed to the LL&E Trust, refuse to give a proper accounting of amounts due and owing to the LL&E Trust, and manipulated charges and estimates to devalue and defund the LL&E Trust's royalty interests.

\*       \*       \*

10

3.27. LL&E Trust holds an enforceable property interest in the Escrowed Funds and other ongoing royalties payable to LL&E Trust under the Conveyance as proceeds of the Conveyance, and/or the Debtor Defendants are holding the Escrowed Funds and other ongoing royalties payable to LL&E Trust under the Conveyance in an express, constructive, or resulting trust, or otherwise for the benefit of LL&E Trust. . . .

\* \* \*

3.51. LL&E Trust, Breitburn and Quantum dispute their respective rights and obligations under the Conveyance Agreement, and as to the Escrowed Funds and other ongoing royalties payable to LL&E Trust for its property interests as transferred in the Conveyance Agreement. LL&E Trust seeks a declaratory judgment that LL&E Trust's rights are as set forth in the pleading above, based on the facts of this case, applicable law as applied to those facts, and/or equitable principles (including but not necessarily limited to principles of estoppel).

3.52. Specifically, and without limiting the foregoing, LL&E Trust requests that this Court find: 1) by conveying to LL&E Trust the net overriding royalty interests, the Conveyance Agreement conveyed real property interests to LL&E Trust while also providing for contractual rights and duties as to the management of those property interests; 2) the Escrowed Funds are LL&E Trust's property and properly payable to LL&E Trust as the property interest holder and not as an unsecured creditor; and 3) that other ongoing royalties payable to LL&E Trust for its property interests under the Conveyance are LL&E Trust's property and properly payable to it as the property interest holder and not as an unsecured creditor.

\* \* \*

3.5. As a result of Quantum and Breitburn's breach of their contractual obligations with respect to LL&E Trust's real property

11

interests, LL&E Trust sustained injuries and damages that were the natural, probable, and foreseeable consequence of the breaches. LL&E Trust hereby seeks its actual damages, attorneys' fees and expenses, court costs, and pre-judgment and post-judgment interest.

In his application for deposit into the court's registry and temporary injunction Parsons asserted that he was bringing the application in his capacity as trustee of the Trust:

> Defendant ROGER D. PARSONS, solely in his capacity as trustee of the LL&E ROYALTY TRUST ("Parsons" or the "LL&E Trust"), submits this application for an order compelling deposit of the Special Escrow into the Court's registry . . . .

In joint stipulations, Parsons and Breitburn agreed that the parties would not "dispute the factual statements" listed in the stipulations for purposes of the application for a temporary injunction and for deposit into the court's registry. Significantly, Parsons agreed to the following as to the Partnership:

> 9. On June 28, 1983, LLEC entered into substantially identical agreements with the LL&E Royalty Partnership, each entitled "Conveyance of Overriding Royalty Interests," with each Conveyance varying only by the interests covered, but not by any material terms (the "Conveyances").

> 10. Under the terms of the Conveyances, LLEC, as Assignor, conveyed to the LL&E Royalty Partnership, as Assignee, the right to receive "Net Proceeds" (as defined in the Conveyance) associated with LLEC's mineral interests.

*     *     *

12

12. From 1983 to 2006, the Assignor paid the LL&E Royalty Partnership over $300,000,000 in Net Proceeds from the Jay Field at an average of a little over $13,000,000 a year.

\* \* \*

16. Since 2008, the Assignor has not paid any money to the LL&E Royalty Partnership.

\* \* \*

18. The LL&E Royalty Partnership has not received any payments under the Conveyances since 2008.

As an initial matter, Parsons argues that Breitburn did not properly verify that he lacks capacity to recover the funds in the court's registry. Specifically, Parsons asserts that the affidavit attached in support of Breitburn's verified answer is not sufficient because it does not verify any of the facts alleged as to Parsons and the Trust as true and correct and it is not based on personal knowledge. Therefore, according to Parsons, Breitburn has waived its capacity defense.

Rule 93 requires that a pleading, which alleges that the plaintiff does not have the legal capacity to sue or is not entitled to recover in the capacity in which it sues, must be verified unless the truth of such matters appear of record. Tex. R. Civ. P. 93; *Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 56 (Tex. 2003); *Pledger v. Schoellkopf*, 762 S.W.2d 145, 146 (Tex. 1988) (per curiam). A party who fails to raise the issue of capacity in the trial court may not raise it for the first time on appeal. *Ray Malooly Trust v. Juhl*, 186 S.W.3d 568, 571 (Tex. 2006) (per curiam); *Sixth RMA Partners, L.P.*, 111 S.W.3d at 56; *Nootsie, Ltd.*, 925 S.W.2d at 662;

13

*Harrison v. Reiner*, 607 S.W.3d 450, 459 (Tex. App.—Houston [14th Dist.] 2020, pet. denied).

Breitburn responds that it properly verified its capacity-defense. Breitburn further contends that, if its capacity-defense had not been verified, the issue was tried by consent. Issues subject to pleading requirements, such as verified denials, may be tried by consent. *Highland Credit Opportunities CDO, L.P. v. UBS AG*, 451 S.W.3d 508, 516 (Tex. App—Dallas 2014, no pet.); *1 Lincoln Fin. Co. v. Am. Family Life Assur. Co. of Columbus*, No. 02-12-00516-CV, 2014 WL 4938001, at *3 (Tex. App.—Fort Worth Oct. 2, 2014, no pet.) (mem. op.) (citing *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex. 1991); *Basic Capital Mgmt., Inc. v. Dynex Com. , Inc.*, 348 S.W.3d 894, 899 (Tex. 2011)). Unpleaded claims or defenses that are tried by express or implied consent of the parties are treated as if they had been raised by the pleadings. *Roark*, 813 S.W.2d at 495. The party who allows an issue to be tried by consent and fails to raise the lack of pleading before submission of the case cannot later raise the pleading deficiency for the first time on appeal. *Id.*

At the hearing, Parson's counsel stated with respect to capacity:

> And to address the capacity argument, you will hear and there is evidence that the Trustee asked the managing partner, Conoco, to take care of this. And they did nothing. But it is a general partnership. And a general partner, any general partner, can sue on behalf of the partnership if it is necessary. And that is exactly what's in this case and that dispenses basically with the standing argument.

Parsons never objected to any lack of pleadings by Breitburn on its capacity argument. Parsons had an opportunity to object to the any lack of pleading of

14

capacity, but instead, addressed the merits of the defense. *Cf. Basic Capital Mgmt., Inc.*, 348 S.W.3d at 899 (holding where capacity was raised in cross-motions for summary judgment, there was no longer any need for verified pleading); *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006) (per curiam) (holding where non-movant raised discovery rule for first time in response to motion for summary judgment that was based on statute of limitations, movant could object to failure to plead discovery rule or respond on merits and try issue by consent); *Edwards v. Fed. Nat'l Mortg. Ass'n*, 545 S.W.3d 169, 177–78 (Tex. App.—El Paso 2017, pet. denied) (holding that defendant's challenge to execution of document was tried by consent where plaintiff did not complain about defendant's failure to challenge execution of document in verified answer, but instead raised defense in response to motion for summary judgment). Therefore, here, the issue of capacity was tried by consent.

A Texas Partnership is "an entity distinct from its partners. *Am. Star Energy & Minerals Corp. v. Stowers*, 457 S.W.3d 427, 429 (Tex. 2015) (quoting Tex. Bus. Orgs. Code § 152.056). "As an independent entity, a partnership may enter into contracts in its own name, may own its own property, and may sue and be sued in its own name." *Id.* (citing Tex. Bus. Orgs. Code § 152.101; Tex. R. Civ. P. 28). "Partnership property is not property of the partners." Tex. Bus. Orgs. Code § 152.101; *see also Siller v. LPP Mortg., Ltd.*, 264 S.W.3d 324, 329 (Tex. App.—San Antonio 2008, no pet.) ("[I]f the property was, in fact, partnership property, it could not be considered property of the individual partners."). "A 'partnership' is not an interest in any specific partnership property. Instead, it is the partner's right to receive his distributive share of the profits and surpluses of the partnership."

15

*Stanley v. Reef Secs., Inc.*, 314 S.W.3d 659, 664 (Tex. App.—Dallas 2010, no pet.). In Texas, a cause of action accruing to the partnership is partnership property and a partner may not bring suit on such cause of action. *See Cates v. Int'l Tel. & Tex. Corp.*, 756 F.2d 1161, 1173, 1176 (5th Circ. 1985) (applying rule to general partnership).

Parsons acknowledges that a general partnership in Texas may file a claim on its own behalf under the Texas Business Organizations Code, but argues that there is no statute or common law rule holding that only the partnership, and not the partners, may pursue the rights of the partnership. Instead, according to Parsons, the common law rule in Texas is that general partners are proper parties to pursue the rights of a general partnership. *See, e.g.*, *Eagle Props., Ltd. v. Texas Commerce Bank*, No. 08-00-00118-CV, 2000 WL 1268185, *1 (Tex. App.—El Paso Sept. 7, 2000, no pet.) (mem. op., not designated for publication) (stating that "[a] partner may bring suit on behalf of a partnership").

Parsons argues that, as long as all of the general partners are parties to a lawsuit, then any of the partners may pursue a claim for the general partnership. *See Allied Chem. Co. v. DeHaven*, 824 S.W.2d 257 (Tex. App.—Houston [14th Dist.] 1992, no writ). In *Allied Chemical Company*, DeHaven, Novak, Phillips, and Reams were partners of Maglon Partnership. *Id.* at 260. DeHaven sued Maglon, Novak, Phillips, Reams, Allied, Gambrell, and others for fraud and conspiracy in the breach of a contract. *Id.* Allied asserted that DeHaven lacked standing "***to sue on behalf of Maglon***," the partnership. *Id.* at 264 (emphasis added). The court observed that DeHaven was a Maglon partner at all relevant times relating to the transaction that

16

formed the basis of the lawsuit. *Id.* The court stated that "[a]lthough a partnership has standing to file suit in its own name, Tex. R. Civ. P. 28, the common law rule that all partners can bring suit themselves ***on behalf of the partnership*** is still in force." *Id.* (emphasis added). The court explained that the purpose for the common law rule was to protect third parties from multiple lawsuits and judgments. *Id.* Therefore, the facts that DeHaven was the plaintiff and Reams, Phillips, Novak, and Maglon were defendants were irrelevant and the common law rule was satisfied because all partners were parties to the suit. *Id.*

Parsons argues that nothing in the Texas Business Organizations Code limits or restricts *Allied's* holding that any general partner may pursue a claims for a general partnership if all partners are parties to the suit. Breitburn argues that the legislature's statutory scheme has replaced the common law rule.

Parsons's reliance on *Allied* is misplaced and it is not necessary to decide whether the common law rule has been abrogated by statutes enacted subsequent to the *Allied* decision.[4] In *Allied*, the court specifically explained that the common law rule was "that all partners can bring suit themselves ***on behalf of the partnership*** is still in force." *Id.* (emphasis added). Here, Parsons never pleaded that he, as trustee of the Trust, which was a partner in the Partnership, was bringing any claims on behalf of the Partnership.

---

[4] *Allied* was decided in 1992; in 1993, the Legislature enacted the Texas Revised Uniform Partnership Act ("TRPA"). The Texas Supreme Court in *In re Allcat Claims Service, L.P.,* 356 S.W.3d 455 (Tex. 2011) (orig. proceeding), noted that the TRPA "unequivocally embrace[d] the entity theory of partnership by specifically stating . . .that a partnership is an entity distinct from its partners." *Id.* at 464. Although there is a question of whether *Allied* is still good law, it is not necessary to reach that decision.

We conclude that Breitburn established the affirmative defense of capacity and, therefore, the trial court abused its discretion by ordering Breitburn to deposit the disputed funds into the court's registry.

**No Adequate Remedy by Appeal**

Having concluded that Breitburn established the trial court's abuse of discretion, we must determine whether Breitburn has an adequate remedy by appeal.

Courts are to assess the adequacy of an appellate remedy by balancing the benefits of mandamus review against the detriments. *In re Team Rocket, L.P.*, 256 S.W.3d 257, 262 (Tex. 2008) (orig. proceeding). Because this balancing depends in large measure on the circumstances presented, courts look to principles rather than simple rules that treat cases as categories. *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 464 (Tex. 2008) (orig. proceeding). Whether an appeal amounts to an adequate remedy depends heavily on the circumstances. *In re Garza*, 544 S.W.3d 836, 840 (Tex. 2018) (orig. proceeding) (per curiam). Mandamus review may be necessary to prevent the loss of substantive or procedural rights. *In re Reece*, 341 S.W.3d 360, 374 (Tex. 2011) (orig. proceeding).

Interlocutory review of a prejudgment order to deposit funds into the court's registry is not available, and the order itself will cease to be of effect once a judgment is rendered. *Warrior Energy Servs. Corp.*, 599 S.W.3d at 118–19. Any appeal of such an order after judgment would become moot. *Id.* at 119. Therefore, "[a] party ordered to deposit funds during the pendency of the lawsuit would not only be deprived of the use of its funds, but would be precluded from challenging the trial

court's order by appeal." *Id.* (quoting *In re G-M Water Supply Corp.*, No. 12-16-00223-CV, 2016 WL 6873181, at *3 (Tex. App.—Tyler Nov. 22, 2016, orig. proceeding) (mem. op.)). Breitburn would lose a substantial right—the right of the use of its funds—if it could not challenge the deposit order until after a decision in an appeal from a final judgment. We conclude that Breitburn does not have an adequate remedy by appeal.

## CONCLUSION

We hold that the trial court abused its discretion by ordering Breitburn to deposit the $13.4 million into the registry of the court and Breitburn does not have an adequate remedy by appeal. Accordingly, we conditionally grant Breitburn's petition for writ of mandamus and direct the court to vacate its May 20, 2021 order. We are confident the trial court will act in accordance with this opinion. The writ of mandamus shall issue only if the court fails to do so.

PER CURIAM

Panel consists of Justices Bourliot, Poissant, and Wilson.