**Dismissed in Part and Reversed and Rendered in Part and Memorandum Opinion filed February 28, 2023.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-21-00310-CV

---

**BREITBURN OPERATING, LP, SUCCESSOR-IN-INTEREST TO QRE OPERATING, LLC; BREITBURN MANAGEMENT COMPANY, LLC; BREITBURN ENERGY PARTNERS, LP; QR ENERGY, LP; AND MAVERICK NATURAL RESOURCES, LLC, Appellants**

**V.**

**ROGER D. PARSONS, IN HIS CAPACITY AS TRUSTEE OF THE LL& E ROYALTY TRUST, Appellee**

---

**On Appeal from the 133rd District Court
Harris County, Texas
Trial Court Cause No. 2015-47031**

---

## M E M O R A N D U M   O P I N I O N

In this oil and gas case, appellants challenge two interlocutory orders of the trial court—an order compelling them to deposit the remaining balance of a bank account into the registry of the court and an order granting a temporary injunction. We dismiss this appeal as moot to the extent that the appellants challenge the first

order because the trial court has vacated the order after this court directed the trial court to do so in a mandamus proceeding, and the trial court has not replaced the vacated order with another order. As to the temporary-injunction order, we reverse and render because the trial court abused its discretion in finding that appellee has a probable right to the relief he seeks.

## I. Factual and Procedural Background

In June 1983, the Louisiana Land and Exploration Company ("LL&E") created the LL&E Trust (the "Trust"). LL&E and the Trust then created the LL&E Royalty Partnership, a Texas general partnership (the "Partnership"). Under the terms of the partnership agreement, the Trust has a 99% interest in the Partnership and the managing general partner has a 1% interest. LL&E originally was the managing general partner of the Partnership, but ConocoPhillips Company ("Conoco") is now LL&E's successor as the managing general partner. Conoco and the Trust are the only partners in the Partnership. The Partnership was formed for the purpose of receiving and holding overriding royalty interests, receiving proceeds from the overriding royalty interests, paying the liabilities and expenses of the Partnership, and disbursing remaining revenues to the Trust and managing general partner.

LL&E entered into substantially identical agreements with the Partnership, each entitled "Conveyance of Overriding Royalty Interests," with each conveyance varying only by the interests covered, but not by any material terms (the "Conveyances"). One of the oil and gas properties in which LL&E owned mineral interests at the time of the Conveyances was the Jay Field, located in Alabama and Florida. The Jay Field is subject to a separate Conveyance for each of those states. The Assignor that owns the working interest in the Jay Field is responsible for overseeing the operations and sales of hydrocarbons from the field. Under the

2

terms of the relevant Conveyances, LL&E, as Assignor, conveyed to the Partnership, as Assignee, overriding royalty interests under which the Partnership has the right to receive the "Net Proceeds" associated with LL&E's mineral interest, as specified in the Conveyances. Net Proceeds means, for each month, the excess, if any, of the Gross Proceeds for such month over the Production Costs for such month.[1]

Quantum Resources Management, LLC ("Quantum") purchased the working interests in the Jay Field in December 2006 and became the operator in April 2007. In 2012, Quantum transferred its working interests in the Jay Field to QRE Operating, LLC ("QRE"), a subsidiary of QR Energy, LLC ("QR Energy"). QRE became the Assignor under the Conveyances. Later, Breitburn Operating LP ("Breitburn Operating") acquired all of QRE's interests in the Jay Field. Currently Breitburn Operating is the Assignor under the Conveyances and also the working-interest owner and operator of the Jay Field.

From 1983 to 2006, the Assignor paid the Partnership over $300,000,000 in Net Proceeds from the Jay Field, which averaged a little over $13,000,000 a year. Since 2008 the Partnership has not received any payments under the Conveyances, nor has the Assignor paid any money to the Partnership.

The Conveyances allow the Assignor to set aside funds for future costs or "Special Costs," which include such items as the estimated costs of plugging and abandoning the wells on the property and estimated future capital expenditures on

---

[1] Although the Jay Field is in Alabama and Florida, the Jay Field Conveyance for Florida contains a choice-of-law provision specifying that the Conveyance "shall be governed by and construed in accordance with the laws of the State of Texas," except with respect to those matters as to which the laws of Florida are mandatorily applicable because the Leases in question affect lands in Florida. Based on the stipulations, the Jay Field Conveyance for Alabama contains a substantially similar choice-of-law provision, with Alabama law applying in the exceptional case.

the property. Such Special Costs are not borne by the Partnership, but by the Assignor, which is now Breitburn Operating. Under certain circumstances, the Conveyances provide that the Assignor may put funds to cover the Special Costs into a Special Cost Escrow Account. The Conveyances also provide that "Assignor may, in its sole discretion, elect to refrain from actually placing funds in escrow but nevertheless calculate and pay amounts attributable to the Overriding Royalty Interest as if funds had been placed in escrow . . . ."

In 2014, counsel for the Trust wrote a letter to Quantum and QR Energy (collectively, the "Quantum Parties"). The Trust questioned the Quantum Parties' failure to pay the Trust "tens of millions of dollars in royalties due to the Trust under the terms of the parties' written agreements," noting that the last recurring overriding royalty interest payment made to the Trust was before April 2007 and a single nonrecurring payment was made in September 2008. The Trust alleged that the Quantum Parties were making payments to the Special Cost Escrow Account instead of making the contractually obligated royalty payments to the Trust.

The Trust alleged that the Quantum Parties had breached the Conveyance by (1) refusing to make the overriding royalty interest payments to the Trust for over seven years, (2) increasing the amount of the Special Cost Escrow Account by approximately $40 million in the previous three years, while refusing to make any royalty payments to the Trust, and (3) holding the Special Cost Escrow Account funds in an internal account rather than with an independent escrow agent. The Trust demanded that the Quantum Parties (1) pay the Trust its portion of the Special Cost Escrow Account (allegedly 50% of the total balance), (2) begin making monthly overriding royalty interest payments to the Trust, and (3) transfer the entire balance of the Special Cost Escrow Account from the internal account to an account controlled by an independent escrow agent. The Trust concluded by

4

suggesting that the parties meet to discuss the issues raised in the letter, or it would pursue its legal rights.

Quantum's counsel responded to the Trust's letter asserting that Quantum had complied with each of the provisions of the Conveyance dated June 28, 1983. Quantum's counsel stated that the Jay Field, as recognized in the Trust's correspondence, was shut down in the latter part of 2008 and through most of 2009. Quantum averred that the shutdown was not because of an intent by Quantum to avoid its obligations under the Conveyance but instead was necessitated due to crude oil prices being significantly below the operating cost of the Jay Field on a per barrel basis.

Moreover, according to Quantum, capital improvements were made in 2009 so that the Jay Field would again operate profitably. Quantum asserted that the success of such improvements was evidenced by the continued increase in production and revenue. Quantum stated that the Trust's portion of the capital improvements incurred in 2009 as well as the operating expense to maintain the existing facilities at the Jay Field during the shutdown were borne by Quantum, thus creating an Excess Production Cost balance. Quantum stated that the Trust would begin receiving royalty payments once the Excess Production Cost balance was paid down. Quantum agreed that an independent escrow agent should be used to steward the Special Cost Escrow account, and Quantum stated that it had established an account at Wells Fargo Bank (the "Wells Fargo Account") with a deposit of $18,051,909.

In August 2015, QRE filed in the trial court a petition for declaratory judgment against Roger D. Parsons, "solely in his capacity as Trustee of [the Trust]." QRE stated that the purpose of the declaratory judgment action was to determine the rights and obligations arising from the Jay Field Conveyance for

5

Florida.

In February 2016, Parsons, solely in his capacity as Trustee of the Trust, filed an original counterclaim and third-party petition against QRE and various Breitburn entities alleging that they failed to properly calculate the royalties owed to the Trust and alleging in the first count that they breached the Conveyance by refusing to pay the Trust royalties, overstating future expenses related to the special escrow account, and refusing to contribute their share of special escrow costs.

QRE, QR Energy, Breitburn Operating, and other Breitburn entities filed bankruptcy petitions under Chapter 11 of the United States Bankruptcy Code in May 2016. The Trust sought relief from the bankruptcy stay so that Parsons could pursue his claims against the bankruptcy debtors in the trial court below. In April 2017, the bankruptcy court granted in part the requested relief and lifted the stay so that QRE could pursue its claims in the trial court below and so that Parsons could pursue his claims for breach of the Conveyance in count one of his counterclaim/third-party petition.

In September 2019, Parsons, solely in his capacity as trustee of the Trust, filed a third amended answer, amended counterclaim and amended third-party petition against QRE, various Breitburn entities, Conoco, and others. Parsons alleged that the Partnership owns the interests at issue and that Conoco is the managing general partner of the Partnership. Parsons alleged that QRE, QR Energy, Breitburn Management, and Breitburn Energy (collectively "QRE and Breitburn") failed to pay overriding royalties to the Trust as required by the Conveyance. According to Parsons, instead of paying the overriding royalties to the Trust as required under the Conveyance, QRE and Breitburn caused the funds to be deposited in the Wells Fargo Account. Parsons asserted that the Trust held an

6

enforceable property interest in the funds in the Wells Fargo Account and in the royalties payable under the Conveyance. In the first count, Parsons alleged that QRE and Breitburn breached their duties under the Conveyance in various ways, including by refusing to pay royalties to the Trust. Parsons alleged that the Trust sustained damages as a result of these alleged breaches of the Conveyance. In the first count, Parsons also sought various declarations as to the Trust's alleged property interests under the Conveyance. In another count Parsons sued Conoco as general managing partner of the Partnership for breach of the Partnership Agreement, alleging that Conoco failed and refused to ensure payment of royalties to the Trust and compliance by QRE and Breitburn with the Conveyance. Parsons claimed that Conoco took no steps under the Conveyance to protect and enforce the rights of the Partnership or the Trust. In a separate count, Parsons asserted a claim against Conoco for breach of fiduciary duty.

In December 2019 Breitburn Operating took the place of the plaintiff in the trial court below by filing the Second Amended Petition as successor-in-interest to QRE Operating. Breitburn Operating also filed a verified second amended answer as successor-in-interest to QRE Operating, along with Breitburn Management Company LLC, Breitburn Energy Partners LP, and QR Energy LP, asserting that "The Trust is not entitled to recover in the capacity in which it sues."

On April 12, 2021, Breitburn Operating notified the Partnership that it intended to withdraw the funds in the Wells Fargo Account and close the account effective April 15, 2021. Breitburn Operating explained that when the Wells Fargo Account was created, it was funded to an amount of money that equaled fifty percent of the balance of the Special Cost Escrow Account. Breitburn Operating stated that, as of April 12, 2021, the balance of the Wells Fargo Account was $19,085,585.38, which far exceeded fifty percent of the balance of the Special Cost

7

Escrow Account—$14,811,984.78. Breitburn Operating notified the Partnership that it was withdrawing funds from the Wells Fargo Account to reimburse itself for Special Costs it previously had incurred and to reconcile the balance in the Wells Fargo Account to an amount equal to fifty percent of the Special Costs Escrow Account balance.

Parsons filed an emergency application for an order compelling the deposit of the Wells Fargo Account into the court's registry or, alternatively, for a temporary restraining order prohibiting appellants Breitburn Operating LP, sucessor-in-interest to QRE Operating, LLC, Breitburn Management Company, LLC, Breitburn Energy Partners, LP, QR Energy, LP, and Maverick Natural Resources, LLC (collectively, the "Breitburn Parties") from liquidating or drawing down the Wells Fargo Account. After a hearing, the trial court signed a temporary restraining order, prohibiting the Breitburn Parties from closing, liquidating, or depleting the Wells Fargo Account to an amount below $13,400,000.

In May 2021, Parsons, solely in his capacity as trustee of the Trust, filed an application for an order compelling the deposit of the funds in the Wells Fargo Account into the court's registry or, alternatively, for a temporary injunction prohibiting the Breitburn Parties from closing, liquidating, or depleting the Wells Fargo account or otherwise withdrawing or transferring any funds from the account. The parties filed a stipulation of undisputed facts for the purposes of Parsons's application for a temporary injunction. After holding a hearing on the application, the trial court signed two orders on May 20, 2021. In one the trial court ordered the Breitburn Parties to deposit the entire remaining balance of the Wells Fargo Account, in the amount of at least $13,400,000.00, into the court's registry (the "Deposit Order"). In the other, the trial court granted a temporary injunction prohibiting the Breitburn Parties from closing, liquidating, or depleting

the Wells Fargo Account to a balance below $13,400,000, or otherwise withdrawing or transferring any of the $13,400,000 from the Wells Fargo Account (the "Temporary Injunction Order"). Breitburn Operating deposited the $13,400,000 into the court's registry. The Breitburn Parties timely perfected an interlocutory appeal from each of the two orders, and they have asserted appellate jurisdiction under section 51.014(a)(4) of the Civil Practice and Remedies Code. In Cause Number 14-21-00337-CV in this court, the Breitburn Parties sought mandamus relief as to the Deposit Order, but did not seek any relief as to the Temporary Injunction Order. *See In re Breitburn Operating, LP*, No. 14-21-00337-CV, 2022 WL 2920679, at *3–4 & n.3 (Tex. App.—Houston [14th Dist.] Jul. 26, 2022, orig. proceeding) (mem. op.).

## II. ISSUES AND ANALYSIS

### A.     Is the Breitburn Parties' appeal from the Deposit Order moot?

In their third issue, the Breitburn Parties challenge the Deposit Order. In a separate original proceeding this court granted mandamus relief and directed the trial court to vacate the Deposit Order. *See In re Breitburn Operating, LP*, 2022 WL 2920679, at *9. As directed by this court, the trial court has vacated the Deposit Order. Because the challenged order has been vacated by the trial court and not replaced with another order, the Breitburn Parties' appeal is moot to the extent that they appeal from the Deposit Order. *See* Tex. R. App. P. 27.3; *Deep Water Slender Wells, Ltd. v. Shell Intern. Exploration & Production, Inc.*, 234 S.W.3d 679, 695–96 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Thus, we dismiss as moot the third issue and the part of the first issue in which the Breitburn Parties challenge the Deposit Order. *See id*. To the extent the Breitburn Parties appeal from the Deposit Order, we dismiss the appeal as moot. *See id*. Because we lack jurisdiction over the appeal from the Deposit Order due to

9

mootness, we need not and do not address Parsons's argument on appeal that section 51.014(a)(4) of the Civil Practice and Remedies Code does not provide this court with appellate jurisdiction over the appeal to the extent that the Breitburn Parties appeal from the Deposit Order.

**B.    Did the trial court abuse its discretion in issuing the Temporary Injunction Order?**

In their second issue and in part of the first issue the Breitburn Parties challenge the trial court's Temporary Injunction Order. A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Id*. An applicant for a temporary injunction is not required to establish that it will prevail on final trial. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). Where, as here, no applicable statute provides otherwise, to obtain a temporary injunction, the applicant must plead and prove three elements: (1) a claim against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204. Whether to grant or deny a temporary injunction is within the trial court's sound discretion, and we reverse the trial court's grant or denial only if the trial court abused its discretion. *Id*. We must not substitute our judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Id*. An abuse of discretion occurs when a court acts in an arbitrary or unreasonable manner, or without reference to guiding rules and principles. *Downer v. Aquamarine Operators*, 701 S.W.2d 238, 241–42 (Tex. 1985). In resolving evidentiary matters, a trial court does not abuse its discretion if some evidence reasonably supports the court's ruling. *See Abbott v. Anti-Defamation League Austin, Southwest, and Texoma Regions*, 610 S.W.3d 911,

10

916–917 (Tex. 2020). A clear failure by the trial court to analyze or apply the law correctly constitutes an abuse of discretion. *See id.* at 916–917.

In the Temporary Injunction Order, the trial court made the following findings as to the "probable right to the relief sought" element:

> The Court finds that Parsons has established a probable right to relief on his claims against the [Breitburn Parties] for breach of [the Breitburn Parties'] duty to make monthly overriding royalty payments (calculated net of certain expenses) as required by the Jay Field Conveyances. In particular, the Court finds that Parsons has established a probable right that $13,356,193 of the funds in the [Wells Fargo Account] represent accrued but unpaid royalties that Parsons is entitled to receive under the Conveyances.

The Breitburn Parties argue that the trial court abused its discretion in finding that Parsons had a probable right to the relief he sought. The Partnership has two partners: (1) the Trust, a non-managing general partner; and (2) Conoco, the managing general partner. Parsons is the trustee of the Trust. The Agreement of General Partnership of the Partnership provides as follows:

> To facilitate the operations of the Partnership, the Partners hereby delegate to and vest in the Managing General Partner full, exclusive and complete discretion in the operation of the Partnership including the right and the power, on behalf of the Partnership . . . to receive payments attributable to the Royalties and, after payment or provision for payment of any liabilities of the Partnership (including any reserves established pursuant to Section 5.02 hereof), to distribute the proceeds of the Royalties and any other income of the Partnership to the Partners in accordance with their Sharing Ratios.

The Breitburn Parties contend that Parsons and the Trust lack capacity to pursue claims for alleged breaches of the Conveyances. Instead, without conceding that any party other than Breitburn Operating is entitled to the funds, the Breitburn Parties assert that only the Partnership, which is the assignee under the Conveyances, has capacity to sue for any alleged breaches of the Conveyances or

11

for any proceeds from the Jay Field.

A party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy. *Pike v. Texas EMC Management, LLC*, 610 S.W.3d 763, 775 (Tex. 2020). The Supreme Court of Texas has concluded that the question whether a claim brought by a partner actually belongs to the partnership is a matter of capacity because it is a challenge to the partner's legal authority to assert the claim. *See Pike*, 610 S.W.3d at 779. A partner's lack of authority to recover on a claim that belongs to the partnership is not a matter of constitutional standing and does not implicate subject-matter jurisdiction. *See id.* at 775.

The Partnership is not a party in this case. In his live pleading, Parsons makes clear that he is asserting claims and seeking damages only in his capacity as trustee of the Trust, not on behalf of the Partnership. Parsons states that he filed his live pleading "solely in his capacity as trustee of the [Trust]." Parsons describes himself in the pleading as the "Defendant/Counter-Plaintiff/Third Party Plaintiff . . . who has been sued and now sues solely in his capacity as trustee of the [Trust]." In his live pleading, Parsons alleges the following:

> 3.13  This case involves the breach of certain contractual and fiduciary duties owed to the [Trust] with respect to the [Trust's] real property interests. The Counter-Defendant and Third-Party Defendants conspired to, among other things, refuse to pay certain oil and gas royalties owed to the [Trust], refuse to give a proper accounting of amounts due and owing to the [Trust], and manipulated charges and estimates to devalue and defund the [Trust's] royalty interests.
>
> . . .
>
> 3.27  [The Trust] holds an enforceable property interest in the Escrowed Funds and other ongoing royalties payable to [the Trust] under the Conveyance as proceeds of the Conveyance, and/or the

12

Debtor Defendants are holding the Escrowed Funds and other ongoing royalties payable to [the Trust] under the Conveyance in an express, constructive, or resulting trust, or otherwise for the benefit of [the Trust]. . . .

. . .

3.52 Specifically, and without limiting the foregoing, [the Trust] requests that this Court find: 1) by conveying to [the Trust] the net overriding royalty interests, the Conveyance Agreement conveyed real property interests to [the Trust] while also providing for contractual rights and duties as to the management of those property interests; 2) the Escrowed Funds are [the Trust's] property and properly payable to [the Trust] as the property interest holder and not as an unsecured creditor; and 3) that other ongoing royalties payable to [the Trust] for its property interests under the Conveyance are [the Trust's] property and properly payable to it as the property interest holder and not as an unsecured creditor.

3.53 . . . Quantum and Breitburn have deprived [the Trust] of its property interests and breached their duties with respect to [the Trust's] property interests, as those duties are set out in the Conveyance Agreement, by (including but not limited to) refusing to pay [the Trust] royalties, overstating future expenses related to the special escrow account, refusing to contribute its share of special escrow costs, by refusing to provide information necessary for the [the Trust] to remain publicly registered, and by refusing a full and complete accounting of the estimated, reserves, interest payments, and escrow sums.

3.54 As a result of Quantum and Breitburn's breach of their contractual obligations with respect to [the Trust's] real property interests, [the Trust] sustained injuries and damages that were the natural, probable, and foreseeable consequence of the breaches. [The Trust] hereby seeks its actual damages, attorneys' fees and expenses, court costs, and pre-judgment and post-judgment interest.

In his application for deposit into the court's registry and temporary injunction, Parsons asserted that he was bringing the application solely in his capacity as trustee of the Trust. In joint stipulations, Parsons and the Breitburn Parties agreed that the parties would not "dispute the factual statements" listed in the stipulations for purposes of the application for a temporary injunction.

13

Significantly, Parsons stipulated to the following as to the Partnership:

> 9. On June 28, 1983, [LL&E] entered into substantially identical agreements with [the Partnership], each entitled "Conveyance of Overriding Royalty Interests," with each Conveyance varying only by the interests covered, but not by any material terms (the "Conveyances").
>
> 10. Under the terms of the Conveyances, [LL&E], as Assignor, conveyed to the [Partnership], as Assignee, the right to receive "Net Proceeds" (as defined in the Conveyance) associated with [LL&E's] mineral interests.
>
> . . .
>
> 12. From 1983 to 2006, the Assignor paid the [Partnership] over $300,000,000 in Net Proceeds from the Jay Field at an average of a little over $13,000,000 a year.
>
> . . .
>
> 16. Since 2008, the Assignor has not paid any money to [the Partnership].
>
> . . .
>
> 18. The [Partnership] has not received any payments under the Conveyances since 2008.

As an initial matter, Parsons argues that the Breitburn Parties did not properly verify that Parsons lacks the capacity to recover for alleged breaches of the Conveyances or to recover the funds in the Wells Fargo Account. Parsons asserts that the affidavit attached in support of the Breitburn Parties' verified answer is not sufficient because it does not verify as true and correct any facts relating to the Trust or Parsons's alleged lack of capacity. Parsons also asserts that the affidavit is invalid because the affiant states that the information is within his personal knowledge or based on information he obtained from sources he believes to be reliable rather than saying that the information is within his personal knowledge. Therefore, according to Parsons, the Breitburn Parties have waived Parsons's alleged lack of capacity.

Under Rule 93 of the Texas Rules of Civil Procedure, a pleading alleging

14

that the plaintiff does not have the legal capacity to sue or is not entitled to recover in the capacity in which the plaintiff sues must be verified, unless the truth of the matter appears of record. *See* Tex. R. Civ. P. 93; *In re Breitburn Operating, LP*, 2022 WL 2920679, at *6. A party who fails to raise the issue of capacity in the trial court may not raise it for the first time on appeal. *Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 56 (Tex. 2003). The Breitburn Parties assert that they properly verified their answer. They also contend that even if Parsons's lack of capacity was not verified by affidavit, this issue was tried by consent. Issues subject to pleading requirements, such as verified denials, may be tried by consent. *See In re Breitburn Operating, LP*, 2022 WL 2920679, at *6; *Highland Credit Opportunities CDO, L.P. v. UBS AG*, 451 S.W.3d 508, 516 (Tex. App—Dallas 2014, no pet.); *1 Lincoln Fin. Co. v. Am. Family Life Assur. Co. of Columbus*, No. 02-12-00516-CV, 2014 WL 4938001, at *3 (Tex. App.—Fort Worth Oct. 2, 2014, no pet.) Unpleaded claims or defenses that are tried by express or implied consent of the parties are treated as if they had been raised by the pleadings. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex. 1991); *In re Breitburn Operating, LP*, 2022 WL 2920679, at *6. A party who allows an issue to be tried by consent and fails to raise the lack of pleading before submission of the case cannot later raise the pleading deficiency for the first time on appeal. *Roark*, 813 S.W.2d at 495; *In re Breitburn Operating, LP*, 2022 WL 2920679, at *6.

At the hearing, Parson's counsel stated with respect to capacity:

> And to address the capacity argument, you will hear and there is evidence that the Trustee asked the managing partner, Conoco, to take care of this. And they did nothing. But it is a general partnership. And a general partner, any general partner, can sue on behalf of the partnership if it is necessary. And that is exactly what's in this case and that dispenses basically with the standing argument.

Parsons did not object to any lack of pleadings by the Breitburn Parties on their

capacity argument, nor did Parsons complain that this matter was not verified by affidavit in the Breitburn Parties' answer. Parsons did not object to the affiant's statement that the information was within his personal knowledge or based on information he obtained from sources he believes to be reliable. Parsons had an opportunity to object to the Breitburn Parties' pleadings regarding the lack of capacity issue, but instead he addressed the merits of this matter. On this record, the issue of Parsons's lack of capacity was tried by consent. *See In re Breitburn Operating, LP*, 2022 WL 2920679, at *6–7; *see also Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 899 (Tex. 2011) (holding where capacity was raised in cross-motions for summary judgment, there was no longer any need for verified pleading); *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006) (per curiam) (holding where non-movant raised discovery rule for first time in response to motion for summary judgment that was based on statute of limitations, movant could object to failure to plead discovery rule or respond on merits and try issue by consent); *Edwards v. Fed. Nat'l Mortg. Ass'n*, 545 S.W.3d 169, 177–78 (Tex. App.—El Paso 2017, pet. denied) (holding that defendant's challenge to execution of document was tried by consent where plaintiff did not complain about defendant's failure to challenge execution of document in verified answer, but instead raised defense in response to motion for summary judgment).

A Texas Partnership is "'an entity distinct from its partners.'" *Am. Star Energy & Minerals Corp. v. Stowers*, 457 S.W.3d 427, 429 (Tex. 2015) (quoting Tex. Bus. Orgs. Code § 152.056). "As an independent entity, a partnership may enter into contracts in its own name, may own its own property, and may sue and be sued in its own name." *Am. Star Energy & Minerals Corp.*, 457 S.W.3d at 429. "Partnership property is not property of the partners." Tex. Bus. Orgs. Code § 152.101; *see also Siller v. LPP Mortg.*, 264 S.W.3d 324, 329 (Tex. App.—San

16

Antonio 2008, no pet.) ("[I]f the property was, in fact, partnership property, it could not be considered property of the individual partners."). "A 'partnership' is not an interest in any specific partnership property. Instead, it is the partner's right to receive his distributive share of the profits and surpluses of the partnership." *Stanley v. Reef Secs.*, 314 S.W.3d 659, 664 (Tex. App.—Dallas 2010, no pet.).

Parsons acknowledges that a general partnership in Texas may file a claim on its own behalf under the Texas Business Organizations Code, but he argues that there is no statute or common law rule holding that only the partnership, and not the partners, may pursue the rights of the partnership. Instead, according to Parsons, the common law rule in Texas is that general partners are proper parties to enforce the rights of a general partnership.

Parsons has sued Conoco, the general managing partner of the Partnership, as a third-party defendant in the trial court. Parsons asserts claims against Conoco for breach of the Partnership Agreement and for breach of fiduciary duty, alleging that Conoco took no steps under the Conveyance to protect and enforce the rights of the Partnership or the Trust. Conoco has not asserted any claims against the Breitburn Parties. Parsons argues that, because both of the partners in the Partnership are parties in this lawsuit, then any of the partners may pursue a claim for the general partnership. Parsons relies on *Allied Chemical Company v. DeHaven*. *See* 824 S.W.2d 257 (Tex. App.—Houston [14th Dist.] 1992, no writ). In that case DeHaven, Novak, Phillips, and Reams were partners of Maglon Partnership. *Id.* at 260. DeHaven sued Maglon, Novak, Phillips, Reams, Allied, Gambrell, and others for fraud and conspiracy in the breach of a contract. *Id.* Allied asserted that DeHaven lacked standing "***to sue on behalf of Maglon***," the partnership. *Id.* at 264 (emphasis added). The court observed that DeHaven was a Maglon partner at all relevant times relating to the transaction that formed the basis

of the lawsuit. *Id.* The court stated that "[a]lthough a partnership has standing to file suit in its own name, Tex. R. Civ. P. 28, the common law rule that all partners can bring suit themselves **on behalf of the partnership** is still in force." *Id.* (emphasis added). The court stated that the purpose for the common law rule was to protect third parties from multiple lawsuits and judgments. *Id.* The court concluded that the facts that DeHaven was the plaintiff and Reams, Phillips, Novak, and Maglon were defendants were irrelevant and the common law rule was satisfied because all partners were parties to the suit. *Id.*

Parsons argues that nothing in the Texas Business Organizations Code limits or restricts *Allied's* holding that any general partner may pursue a claim for a general partnership if all partners are parties to the suit. The Breitburn Parties argue that the legislature's statutory scheme has replaced the common law rule. Parsons's reliance on *Allied* is misplaced, and we need not decide whether the common law rule has been abrogated by statutes enacted subsequent to the *Allied* decision.[2] *See In re Breitburn Operating, LP*, 2022 WL 2920679, at *7–8. In *Allied*, the court stated that the common law rule "that all partners can bring suit themselves **on behalf of the partnership** is still in force." *Id.* (emphasis added). In today's case, Parsons never pleaded that he, as trustee of the Trust, which was a partner in the Partnership, was bringing any claims on behalf of the Partnership. *See In re Breitburn Operating, LP*, 2022 WL 2920679, at *7–8. Parsons has not attempted to bring a derivative action on behalf of the Partnership.[3] *See Pike*, 610

---

[2] *Allied* was decided in 1992; in 1993, the Legislature enacted the Texas Revised Uniform Partnership Act ("TRPA"). *See* Act of May 31, 1993, 73rd Leg., R.S., ch. 917, § 1, 1993 Tex. Gen. Laws 3887, 3893. The Texas Supreme Court in *In re Allcat Claims Service, L.P.*, 356 S.W.3d 455 (Tex. 2011) (orig. proceeding), noted that the TRPA "unequivocally embrace[d] the entity theory of partnership by specifically stating . . .that a partnership is an entity distinct from its partners." *Id.* at 464. Although there is a question of whether *Allied* is still good law, it is not necessary to answer that question to dispose of this appeal.

[3] We do not address whether such a procedure would be available in the context of today's case.

S.W.3d at 776, 780. Nor has Parsons alleged that the Partnership has assigned or transferred to him any of its claims or rights. *See id*. Under the applicable standard of review, we conclude that the trial court abused its discretion in (1) finding that Parsons has a probable right to the relief he seeks, (2) finding that Parsons has a probable right to relief on his claims for breach of the Breitburn Parties' alleged duty to make monthly overriding royalty payments as required by the Conveyances, (3) finding that Parsons has a probable right to receive royalties under the Conveyances, and (4) in granting Parsons's application for a temporary injunction. *See Abbott*, 610 S.W.3d at 917–923; *In re Breitburn Operating, LP*, 2022 WL 2920679, at *4–8; *Texley, Inc. v. Hegar*, 613 S.W.3d 322, 328–30 (Tex. App.—Austin 2020, no pet.). Therefore, we sustain the Breitburn Parties' first issue to the extent it challenges the Temporary Injunction Order.[4]

### III. CONCLUSION

Because the Deposit Order has been vacated by the trial court and not replaced with another order, the Breitburn Parties' appeal is moot to the extent that they appeal from the Deposit Order. Because the trial court abused its discretion in finding that Parsons has a probable right to the relief he seeks and in granting Parsons's application for a temporary injunction, we reverse the Temporary Injunction Order and render judgment denying Parsons's application for a temporary injunction.


/s/    Randy Wilson
        Justice

Panel consists of Justices Bourliot, Poissant, and Wilson.

---

[4] We need not and do not address the Breitburn Parties' second issue.